No. 05-308

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 258

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

GLEN DALE PARKER,

       Defendant and Appellant.

APPEAL FROM:    The District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC 2003-137,
Honorable C.B. McNeil, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Kristina Neal, Assistant Appellate Defender, Appellate Defender
Office, Helena, Montana

       For Respondent:

              Hon. Mike McGrath, Montana Attorney General, John Paulson,
Assistant Attorney General, Helena, Montana

              Robert J. Long, Lake County Attorney, Polson, Montana

Submitted on Briefs:  April 19, 2006

Decided:  October 10, 2006

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    A jury convicted Glen Parker (Parker) of assault with a weapon after trial in the Twentieth Judicial District, Lake County. Parker asserts on appeal that the District Court violated his fundamental constitutional right to confrontation because the District Court's bailiff delivered to the jury room audio-taped evidence not admitted at trial. Parker also alleges ineffective assistance of counsel based on counsel's failure to object to the admission of certain evidence. We reverse and remand for a new trial.

## ISSUES

¶2    We rephrase the issues on appeal as follows:

¶3    1. Whether the District Court violated Parker's constitutional right to confrontation when the bailiff delivered to the jury room a witness's taped interview that had not been introduced into evidence.

2. Whether Parker's counsel ineffectively represented him by failing to object when the bailiff delivered to the jury room audio tapes of a "911" call and police interviews with Parker's children and another witness.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4    On the morning of October 2, 2003, police arrested Parker after a disturbance at his home in Lake County. After police arrived, Parker's wife, Annalisa McDonough, was taken by ambulance to the hospital for treatment of several injuries including a cut to the back of her head, lacerations, and swelling and bruising in both of her shoulders, her right elbow, and her left knee. Police also observed and photographed bruising, swelling, and cuts sustained by Parker's son.

2

¶5 Immediately following Parker's arrest Officer Bell interviewed the couple's four children, and Eve Kratz, an adult houseguest at their home. Each of the five had observed some portion of the events preceding Parker's arrest. Bell recorded all of the interviews he conducted that morning onto one audio-tape. At trial, the State introduced into evidence Bell's taped interviews with Parker's children and played the interviews for the jury. Kratz's statement was not entered into evidence, nor did she testify in person. At the close of arguments the District Court ordered the audio-tape and a tape player delivered to the jury room for use by the jury during deliberations.

¶6 The taped statements given by Parker's children and Kratz on the morning of Parker's arrest implicated Parker for injuries to both McDonough and Parker's son. Also that morning, McDonough told her treating nurse and physician that Parker caused her injuries, and they so testified at trial. However, Parker's family members recanted their recorded statements under oath at trial. Each testified that they either could not remember the details of the event, or had been forced by Kratz to make false statements about Parker's actions.

¶7 Parker's son testified he lied to police because Kratz, a woman he described as six feet tall and weighing 300 pounds, intimidated him. McDonough, Parker's wife, told the jury Kratz "didn't care for [Parker] very much" because he repeatedly asked Kratz to leave after she overstayed by a month McDonough's invitation to "stay a few days" at their home. McDonough said Kratz needed a stable residence to meet the conditions of her probation and avoid going back to prison, and that she had nowhere else to live. Parker's wife also testified under oath that Kratz caused her head injury when Kratz pushed her and her head struck an electric baseboard in the hours before Parker's arrest. She also denied having told medical personnel that Parker caused her injuries.

3

¶8     When the State moved to admit into evidence Officer Bell's taped interviews, Bell provided the following foundation:

> [State]:     I will hand you what's been marked as State's Exhibit 2 and ask if you can identify that?
> [Bell]:      Yeah.  That's the tape.  It's 7:05 a.m., 10/2/03.  It's got my name, my badge number, the CR number for our agency that keeps track of every case, and Annalisa Parker, victim, and kids' statements.
> [State]:     Contained therein is a true and correct copy of your interview with the kids?
> [Bell]:      Yes.
> [State]:     That would be all of the kids?

Bell then indicated the tape contained the statements of each of the Parker children, at which point the District Court admitted the tape, and the prosecutor played the children's statements in open court.  The tape revealed that each Parker child saw a different portion of the events leading up to Parker's arrest, but no one child saw the entirety of the interaction between their parents.

¶9     Unbeknownst to Parker, the tape contained not only the children's statements, but also Kratz's statement recorded by Bell on the morning of Parker's arrest.  When the State played the tape in the courtroom, the prosecutor stopped the tape at the conclusion of the children's statements so neither Parker nor the jury heard Kratz's recorded statement.  Kratz was not called to testify by either party.  Nor did Officer Bell testify as to the content of his interview with Kratz, which revealed Kratz's version of the events preceding Parker's arrest, and a description of Parker's actions.  At the close of arguments the court ordered that the tape and all other admitted evidence be delivered to the jury room, and instructed the jury to consider all of the evidence before submitting a verdict.  Parker's counsel did not object to delivery of the tape to the jury room.

4

¶10 The jury convicted Parker of one count of assault with a weapon in violation of § 45-5-213, MCA, and the District Court sentenced him to a twenty-year prison term with ten years suspended. Parker timely appealed.

## STANDARD OF REVIEW

¶11 We generally review a district court's decision to deliver exhibits in evidence to a jury room during deliberations for an abuse of discretion. *State v. Bales*, 1999 MT 334, ¶ 8, 297 Mont. 402, ¶ 8, 994 P.2d 17, ¶ 8 (citation omitted). The evidence at issue here, however, was not admitted, which requires us to determine whether the District Court's error violated Parker's constitutional right to confront a witness against him. Accordingly, our review of the constitutional law question raised here is plenary. *State v. Mann*, 2006 MT 160, ¶ 10, 332 Mont. 476, ¶ 10, 139 P.3d 159, ¶ 10 (citation omitted).

## ISSUES

### ISSUE ONE

¶12 *1. Whether the District Court violated Parker's constitutional right to confrontation when the bailiff delivered to the jury room a witness's taped interview that had not been introduced into evidence*.

¶13 It is undisputed that during Parker's trial the bailiff delivered to the jury room an audio-tape which included an interview of Kratz recorded by Officer Bell and a tape player for use during deliberations. The record is likewise clear that neither party entered into evidence Kratz's recorded interview, called Kratz to testify in person, or elicited testimony from Officer Bell as to the content of his interview with Kratz.

¶14     Parker contends the jury's exposure to extrinsic evidence violated his right to confrontation under both the United States and Montana Constitutions, and as a result he is entitled to a new trial. Parker argues the prosecution misled the District Court as to the contents of the audio-tape when the State offered the tape into evidence premised upon Officer Bell's testimony that the tape contained interviews with Parker's children. At no time did the State disclose Kratz's interview was on the tape. Parker also asserts there was no reason he should have known that Kratz's interview was delivered to the jury during deliberations, nor should he be required to prove that the jury heard and was prejudiced by Kratz's interview in order to receive a new trial. Parker posits the prosecution's infraction infringed upon his constitutional right to address Kratz's allegations against him, resulted in the District Court's delivery of extrinsic evidence to the jury room, and constituted reversible error entitling him to a new trial.

¶15     The State responds that Parker failed to preserve this issue for direct appeal because he never objected to the delivery of the tape to the jury room, and therefore robbed the District Court of the opportunity to exercise its discretion to disallow the audio-tape exhibit into the jury room in accordance with § 46-16-504, MCA. The State further argues that Parker cannot establish here that the jury actually *heard* Kratz's testimony, and Parker should therefore pursue his claim through post-conviction proceedings. In the alternative, the State contends that delivery of Kratz's interview to the jury was harmless error, cumulative to other admissible evidence, and did not contribute to Parker's conviction.

¶16     Parker counters that Kratz's interview fails harmless error analysis because it struck at the heart of Parker's defense. Parker based his defense on his contention, and his family members' sworn testimony, that Kratz essentially bullied them into making false statements to police and

6

medical personnel. The jury's exposure to Kratz's taped statement, combined with her absence from court, denied Parker the opportunity to counter her version of critical events or challenge her credibility as a witness. Moreover, because the jury never saw Kratz testify in person, it had no opportunity to observe her demeanor, body language, or conduct so as to compare the weight of her testimony against other evidence.

¶17 At the outset of our analysis, we address whether this issue is properly before us on direct appeal given Parker's failure to object to delivery of the tape to the jury room. At trial the prosecutor and Officer Bell represented to the court that the tape contained "a true and correct copy of [Bell's] interview *with the kids*[.] " (Emphasis added.) The transcript reveals that when the prosecutor played the tape in the courtroom listeners heard only the interviews with Parker's children, followed by this exchange:

> Officer Bell: Can you think of anything else, [son]?
> [Son]:        No.
> Officer Bell: Okay. We can get some -- who is this lady --
> (Whereupon, the playing of State's Exhibit 2 was concluded . . . .)

Nothing in this record suggests that Parker should have been alerted that Kratz's interview was also on the tape. When Officer Bell authenticated and laid the foundation for the tape, he represented to the court that the tape was what the State, as its proponent, claimed it to be. M. R. Evid. 901(a). We will not fault Parker for failing to challenge this representation when he had no knowledge to the contrary. Therefore, we conclude that Parker's failure to object at trial does not preclude our consideration of his appeal.

¶18 Further, we must reject the State's contention that because Parker cannot prove on the record before us that the jury actually *heard* Kratz's statements, his claim is not appropriate for consideration on direct appeal. The problem with the State's argument is it presumes that *Parker*

7

must prove both the existence of an error and its prejudicial impact. This is not his burden. It is well established that in the routine case where evidence is erroneously *admitted* and a defendant alleges prejudice, *the State* bears the burden of demonstrating the error was not prejudicial. *State v. Van Kirk*, 2001 MT 184, ¶ 42, 306 Mont. 215, ¶ 42, 32 P.3d 735, ¶ 42. Here, where the evidence was never admitted in the first place and as a result reached the jury without court scrutiny or the defendant's knowledge, it would be illogical to saddle Parker with the burden of proving he was prejudiced as the State would have us do. In the interest of preserving the fundamental fairness of criminal trials, when extrinsic evidence reaches a jury, as it did here, the burden of disproving prejudice must rest with the State as it does in other cases in which harmless error analysis is applied. This being so, we decline to accept the State's invitation to dismiss Parker's challenge.

¶19    We turn now to the merits of Parker's claim. We must determine whether the evidentiary error which occurred at Parker's trial violated his constitutional right to confront the witnesses against him, and whether it was sufficiently prejudicial to require a new trial. We conclude that it was.

¶20    "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witness against him . . . ." U.S. Const. Amend. VI. In Montana, the rights guaranteed an accused in a criminal prosecution, including confrontation, are fundamental. *State v. Clark*, 1998 MT 221, ¶ 20, 290 Mont. 479, ¶ 20, 964 P.2d 766, ¶ 20. The Montana Constitution at Article II, Section 24, provides:

> In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel; to demand the nature and cause of the accusation; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf, and a speedy public trial by

8

an impartial jury of the county or district in which the offense is alleged to have been committed . . . .

An accused criminal is specifically granted the right to "meet the witnesses against him face to face," and accordingly we recognize that "full cross-examination" is a "critical aspect of the right of confrontation." *Clark*, ¶ 22. "Cross-examination is the hallmark of our system of justice because it produces truth. Such things as the demeanor of a witness, his or her body language, and a witness's hesitancy in giving testimony, often communicate as much to the fact-finder as the spoken words. . . ." *Clark*, ¶ 23.

¶21     In the case before us, the jury was given access, and may have listened, to a police interview with a critical eyewitness who did not testify at trial, was not subject to cross-examination, and whose demeanor the jury was never able to observe. While clearly an error occurred, the parties dispute whether the error prejudiced Parker to the extent that a new trial is required. As previously discussed in ¶ 18, we would normally answer such a question by applying the two-step analysis we adopted in *Van Kirk,* and examine whether erroneously admitted evidence was sufficiently prejudicial to require a new trial. ¶ 37. The anomaly in this case, though, is that the evidence in question was never admitted. As this Court has not previously been presented with this peculiar situation, we look to the Ninth Circuit Court of Appeal's decision in *Eslaminia v. White*, for a frame of reference. 136 F.3d 1234 (9th Cir. 1998).

¶22     In *Eslaminia*, the prosecution offered into evidence a taped interview with the defendant which the jury took into the jury room during deliberations. The defendant's lawyers later discovered that the reverse side of the admitted tape contained a police interview with the defendant's brother who had not testified at trial, and whose interview had not been entered in evidence. There, the court said, "It is clear that the jury's consideration of the tape is a serious error

9

of constitutional dimensions." *Eslaminia*, 136 F.3d at 1237. The court then evaluated the prejudicial effect of the extrinsic evidence under the harmless error standard applied to "trial errors" under federal law. The court remanded for a new trial, holding that the tape recording, which bore on the credibility of key witnesses, was prejudicial because credibility was the central issue determining the defendant's culpability. We are persuaded by the *Eslaminia* court's reasoning, and conclude it is reinforced by our *Van Kirk* jurisprudence.

¶23     Under *Van Kirk*, to determine whether Kratz's statement was sufficiently prejudicial to warrant reversal, we first determine whether delivery of the tape was "structural" or "trial" error. ¶ 37. Structural error is that which "affects the framework within which the trial proceeds . . . ." *Van Kirk*, ¶ 38 (citations omitted). Structural errors are presumptively prejudicial, and require automatic reversal. *Van Kirk*, ¶¶ 38-39 (citations omitted). A trial error typically occurs during the presentation of a case to the jury, and is "amenable to qualitative assessment by a reviewing court for prejudicial impact relative to the other evidence introduced at trial." *Van Kirk*, ¶ 40. We conclude that delivery of Kratz's taped statement to the jury was trial, as opposed to structural, error. Therefore, we move to the second step in the *Van Kirk* analysis to determine whether the error was harmless under the circumstances. *Van Kirk*, ¶ 41.

¶24     In order to assess the impact of the error on the trial, we apply the "cumulative evidence" test to determine whether Parker's jury was presented with other admissible evidence that proved the same facts as the tainted evidence—i.e., Kratz's statement—proved. *Van Kirk*, ¶ 43. The "cumulative evidence" standard further requires the State to show that the *quality* of the Kratz statement was such that there was no reasonable possibility that it might have contributed to Parker's conviction. *Van Kirk*, ¶ 44.

10

¶25    The State contends the information Kratz relayed in her statement was harmless because it merely duplicated information presented to the jury through the recorded statements of Parker's family members and the statements McDonough made to medical personnel who testified at trial. Moreover, the State argues, the quality of Kratz's statement was inferior to other admissible evidence because Kratz "viewed only a small part of the incident, did not provide a detailed account of what she saw, and did not see the [alleged] stabbing in the car . . . ."

¶26    We disagree with the State. We conclude that Kratz's recorded statement was of sufficient quality to prejudice Parker's defense and contribute to his conviction. At trial, Parker's family members testified under oath that they lied to Officer Bell and medical personnel on the morning following the alleged assault because they were intimidated by Kratz. They claimed she instructed them to implicate Parker as having caused the injuries suffered by Parker's wife and son. Given Kratz's absence from trial, Parker could not cross-examine her, and the jury had no opportunity to assess either her capability of intimidation or her credibility as compared to McDonough and the Parker children. The subsequent introduction of her taped statement into the jury room then presumably gave the jury Kratz's unchallenged one-sided version of events preceding Parker's arrest, to the State's advantage and Parker's detriment. Moreover, given that no one witness could establish all of the elements of the crime the State charged, Kratz's account was at least as crucial to the prosecution's case as were the statements of Parker's family members, and likely more so, given that all of the eyewitnesses except Kratz recanted their accusations against Parker at trial. Finally, Kratz's statement must be considered of superior quality to the hearsay testimony given by medical personnel who testified at trial. McDonough's treating nurse and physician could relay only what they had been told about the event by McDonough and what they observed about McDonough's

11

injuries and behavior at the hospital, none of which proved any element of the State's charge against Parker.

¶27   We therefore conclude that Parker's constitutional right to confront the witnesses against him was violated when the tape of Kratz's statement to police was delivered to the jury. We further conclude, pursuant to *Van Kirk,* that a reasonable possibility exists that the delivery of Kratz's statement to the jury room contributed to Parker's conviction. Parker is therefore entitled to a new trial.

## ISSUE TWO

¶28   *2.  Whether Parker's counsel ineffectively represented him by failing to object when the bailiff delivered to the jury room audio tapes of a "911" call and police interviews with Parker's children and another witness.*

¶29   We decline to address this issue in light of our resolution of Issue One.

## CONCLUSION

¶30   For the foregoing reasons, we reverse and remand for a new trial.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ JIM RICE

12