

DA 06-0776

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2008 MT 218

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

ROBERT L. WING,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Seventeenth Judicial District,
In and For the County of Valley, Cause No. DC-2005-007
Honorable John C. McKeon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Hooks & Wright, P.C., Helena, Montana

      For Appellee:

          Hon. Mike McGrath, Montana Attorney General, Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

          Kenneth Oster, Valley County Attorney, Glasgow, Montana

Submitted on Briefs:  April 9, 2008

Decided:  June 18, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Robert L. Wing (Wing) appeals his conviction in the Seventeenth Judicial District Court, Valley County for felony criminal distribution of dangerous drugs, felony criminal possession of dangerous drugs, and felony criminal possession of dangerous drugs with intent to distribute. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Sometime prior to April 2005, Wing became the target of an investigation into the criminal distribution of dangerous drugs in the area of Glasgow, Montana. This investigation was carried out by the Valley County Sheriff's Office (VCSO), the Glasgow Police Department (GPD), and the Big Muddy River Drug Task Force (Task Force). In May and December of 2003, members of the Task Force and VCSO conducted interviews with people who had used illegal drugs and claimed that Wing was their source. The GPD conducted a background check of Wing on April 4, 2005, and discovered that he had two prior misdemeanor convictions in 1976 and 1988 for criminal possession of dangerous drugs.

¶3 In late January or early February 2005, a member of the GPD spoke with a confidential informant (CI) named Rondal Arrowood (Arrowood) who claimed he had received illegal drugs from Wing to distribute for a profit. Arrowood stated that Wing would drive a white Cadillac to an unknown location in North Dakota to purchase those drugs. Law enforcement officials were aware that Wing's wife Helen Wing (Helen) drove a car which matched that description. Arrowood also told the GPD that Wing

2

would distribute illegal drugs at the Stockman Bar in Glasgow. Arrowood stated that Wing would keep a supply of drugs in his front pocket while in the bar to sell, and would also keep drugs hidden in a pickup truck he regularly drove, either under the floor mat, behind the seat, or in a black tool box in the bed of the pickup. Later, Arrowood stated he was present at Wing's house on the evening of April 5, 2005, and observed three one-half gram bags of cocaine on Wing's person, as well as a bag of marijuana (which Arrowood believed was approximately three-quarters of an ounce) inside Wing's residence.

¶4 On April 6, 2005, in furtherance of the investigation by the VCSO, the GPD, and the Task Force, Arrowood agreed to attempt a controlled purchase of marijuana from Wing. An audio listening device was placed on Arrowood and tested at approximately 12:25 p.m. Arrowood was then searched at 1:05 p.m. and given $80.00 in U.S. currency. VCSO Undersheriff Vernon Buerkle (Buerkle) recorded the serial numbers of the bills. At approximately, 1:10 p.m. Arrowood went to Wing's residence in Glasgow and was informed by Wing's son, Dennis Wing (Dennis), that Wing was at the Stockman Bar. While he was in Wing's residence, loud music drowned out all but the initial conversation Arrowood had with Dennis. Arrowood then proceeded to the Stockman Bar. Between the time Arrowood left Wing's residence and reached the bar, VCSO officials turned off the audio recording. During this gap in time, Arrowood met with a Task Force investigator, and also went to the Roosevelt Hotel where he lived and grabbed a Dr. Pepper from his truck. Arrowood arrived at the Stockman Bar at approximately 1:31 p.m., followed by law enforcement officials.

3

¶5 When Arrowood entered the Stockman Bar, Buerkle began recording again on the listening device. However, due to noise in the bar, much of the transmission recording was inaudible. While Arrowood was in the bar, a member of the Task Force, Ron Kemp (Kemp) observed a white Cadillac parked in front of the bar. Inside the bar, Arrowood approached Wing and asked him if he had a "bag of smoke." According to Arrowood, Wing at that time agreed to sell him a quarter ounce bag of marijuana for $60.00. Wing then left the bar through the front door, returning approximately two minutes later with a bag of marijuana. Wing then sat next to Arrowood and gave him the bag. In return, Arrowood gave Wing three $20.00 bills. After purchasing the marijuana, Arrowood stayed at the bar for a short period time, leaving around 2:14 p.m. Approximately two minutes later, Arrowood gave Kemp the bag of marijuana, and then proceeded to the Valley County Law Enforcement Center (LEC). Once there, at approximately 2:21 p.m., Arrowood gave Buerkle the remaining $15.00 he had on his person, and was searched by Kemp. At approximately 2:47 p.m., Wing was arrested at the Stockman Bar and transported to the LEC. During the search incident to his arrest, law enforcement found $367.00 in U.S. currency in a black nylon wallet in Wing's left shirt pocket. The serial numbers on three $20.00 bills found in the wallet matched those on the bills given to Arrowood to purchase the marijuana in the controlled buy.

¶6 Based on this information, Chief Deputy for the VCSO Doug Wixson (Wixson) presented a sworn affidavit to Justice of the Peace Linda M. Hartsock on April 6, 2005, at approximately 11:15 p.m., in which he stated that he had probable cause to believe that the offenses of criminal distribution of dangerous drugs, criminal possession of

4

dangerous drugs, and criminal possession of drug paraphernalia had been committed, and that evidence of these crimes would be found at Wing's residence in Glasgow and in the white Cadillac. The affidavit related the above incidents concerning the controlled buy, Wing's previous convictions, and the interviews of individuals who claimed to have purchased drugs from Wing. The affidavit also described with particularity Wing's house and the white Cadillac which had been impounded incident to Wing's arrest, and the evidence Wixson believed would be discovered there. Based on this affidavit, on April 6, 2005, at 11:20 p.m., Justice of the Peace Hartsock granted the State a warrant to search Wing's house as well as the white Cadillac.

¶7 Pursuant to the search of Wing's house, law enforcement seized suspected drug paraphernalia, suspected marijuana, individually packaged bags of suspected marijuana, and a Ziploc bag containing numerous individual baggies of crystal methamphetamine. A search of the white Cadillac revealed suspected drug paraphernalia, six Ziploc bags containing $2,000.00 each, a large amount of suspected crystal methamphetamine, numerous individual baggies of crystal methamphetamine, eight individually packaged baggies of suspected marijuana, and several bricks of suspected marijuana, totaling over sixty grams.

¶8 On May 10, 2005, the State charged Wing by Information with seven felony counts. Count I charged Wing with criminal distribution of dangerous drugs for selling marijuana to Arrowood on April 6, 2005. Counts II and III (both for criminal possession of dangerous drugs) and Counts IV and V (criminal possession of dangerous drugs with intent to distribute) were all based on the evidence seized from the white Cadillac. Count

5

VI involved sales of marijuana and methamphetamine to an individual named Scott McDonald which allegedly occurred between February 2005 and April 6, 2005, in Glasgow. Lastly, Count VII involved sales of marijuana and methamphetamine to an individual named Patricia Brown (Brown) which allegedly occurred between February 2005 and April 6, 2005, in Glasgow.

¶9 Wing applied for and received court-appointed counsel. On December 20, 2005, Wing filed a motion to suppress all the evidence which was seized pursuant to the search warrant. Wing asserted that the search warrant application did not establish probable cause for the issuance of the search warrant. Wing maintained that the reliability of Arrowood in his capacity as a CI had not been demonstrated as required under *State v. Reesman*, 2000 MT 243, 301 Mont. 408, 10 P.3d 83, *overruled on other grounds by State v. Barnaby*, 2006 MT 203, 333 Mont. 220, 142 P.3d 809, and thus the search warrant application was invalid. The District Court disagreed and denied Wing's motion, concluding that Arrowood's reliability had been established under *Reesman* because he had made an unequivocal admission against interest by admitting to police that he had purchased a small amount of marijuana from Wing in the past. *Reesman*, ¶ 34.

¶10 On May 31, 2006, seven days prior to trial, Wing filed a motion in limine seeking the issuance of a protective order to preclude the State from releasing any information, testimony from witnesses, or documents concerning other crimes, wrongs or acts which might relate to Wing at the time of trial. In his memorandum in support, Wing noted that the investigative file pertaining to his case contained numerous interviews, reports, and memoranda which identified other incidents not charged in the Information. Because the

Information only concerned the time period between February 2005 and April 6, 2005, Wing sought to limit the presentation of evidence to matters within those dates. In subsequent motions Wing also sought to exclude the following evidence: (1) testimony from Arrowood or any exhibits related to the controlled buy; and (2) any inadmissible hearsay from Arrowood so long as he did not testify at trial.

¶11 On the first day of trial, before jury selection began, the District Court ruled on Wing's motion in limine. As stated by the District Court,

> [T]he State indicates, in its response to this motion, that it does not intend to introduce evidence of other wrongs, acts, or crimes, and that it had admonished its witnesses that the only acts for which the testimony can be given is for those which the defendant is charged.

> To ensure that the State follows that intent, I will issue a protective order at this point that the only acts for which the testimony can be given are those for which the defendant is charged; to that extent, the motion in limine for other crimes, wrongs, or acts will be granted, otherwise the motion seeks further relief, that further relief is denied.

¶12 In Count VII of the Information, the State alleged that Wing committed the offense of criminal distribution of dangerous drugs by selling methamphetamine and marijuana to Brown in exchange for cash in Glasgow during the time period of February 2005 to April 6, 2005. However, Wing contended that Brown's statements as to when she actually purchased drugs from Wing were either inconsistent or indicated that she had purchased those drugs sometime in 2004. After the District Court's ruling, Wing further expressed his concerns that if Brown gave testimony, she might state that a sale of drugs occurred outside the time frame alleged in the Information, thus putting evidence of other crimes before the jury. In response, the State offered that it would only ask Brown a

7

leading question as to whether she purchased drugs from Wing during the time period of February, March, or the first few days of April 2005. Wing agreed that would be an acceptable solution, and the District Court stated the issue would be handled in that manner.

¶13 During opening statements, the prosecutor made the following statement:

> Patsy Brown will tell you that she bought a little bit of drugs. She'll tell you that she purchased those drugs, *some of those drugs* during the months of February, March, or the first few days of April. (Emphasis added.)

After these statements, Wing's attorney objected that the State had violated the protective order and moved for a mistrial. Wing's attorney argued that both he and Wing heard and registered the statement and that the jury likely did as well. Wing's attorney asserted that he would not be able to reverse the prejudice that this statement had on the jury, as it implied that Brown had brought drugs from Wing at other times. Wing's attorney argued that the "door has now been opened because now the County Attorney has told the jury that there were other drugs involved outside of this time period . . . ."

¶14 After reviewing the transcript, the District Court denied Wing's motion, concluding that the State did not violate the protective order.

> After reviewing the record, the comments by the State's counsel is construed as referring to acts of a witness, namely Patsy Brown, and in reference to the time it relates to acts occurring within the time frame of the charge in Count 7.
>
> As it relates to the purchase of drugs, it refers to the fact that those drugs were purchased by that witness and does not specifically refer to all of those purchases coming from the defendant.
>
> Taken into consideration this is a remark which was made in the course of a thoroughly lengthy opening statement and only refers to several words

8

used in that opening statement, the motion for mistrial is denied. That being said, the State's counsel is cautioned in this area so as to avoid a violation of a protective order.

¶15 On June 8, 2006, during the second day of trial, Wing moved to admit the audio recording made by law enforcement of Arrowood's purchase of drugs. The recording was admitted and Wing played it for the jury. In addition to the recording made by Arrowood during the controlled buy, the tape also contained a conversation between Arrowood and Helen, Wing's wife. However, Wing did not play that portion of the recording to the jury. Wing also presented his son Dennis as a witness. During his testimony, Dennis stated that he had gone to Arrowood's apartment the day after Wing's arrest, where Arrowood offered him marijuana. Wing also presented testimony from an investigator named Jerry Jacobsen who testified that he had used professional transcribing equipment to review the audio recording made by Arrowood during the controlled buy and determined that, due to the poor quality of the tape, there was no evidence on the tape about drugs or money. In his testimony, Jacobson did not refer to the recorded conversation between Helen and Arrowood at the end of the tape.

¶16 During closing arguments, Wing argued that the key to proving the first five charges rested on whether the drugs in the Cadillac were his. Wing maintained that the white Cadillac belonged to his wife Helen, that they had been separated for several years, and that the drugs found in the Cadillac were not his. In his closing, Wing's attorney stated the following:

> One of those interesting facts that almost escapes you until you get to this point of the case, when you're talking about the white Cadillac, do you

recall the search warrant? They said they got a search warrant for both the white Cadillac and my client's house. Remember that?

Now, I haven't seen any evidence and there's a lot of it in this case that we've even stipulated to as far as the foundation of it. There's drugs, there's money, there's drug paraphernalia, but there's none of that in Bob [Wing's] house. Did you see any evidence? Did you hear anything about drug paraphernalia in the house?

¶17 The State objected to these statements and requested to approach the bench. The State maintained it had been prohibited by a pretrial order from introducing any evidence of other crimes, as well as evidence from Wing's house. The State argued that Wing was now telling the jury that it failed to bring in any evidence about drugs in the house, implying somehow that the evidence presented was not sufficient. The District Court overruled the objection, based on the fact that there had been evidence presented at trial concerning the service and scope of the warrant.

¶18 During the State's rebuttal, the prosecution then stated the following:

So the first five charges are not tied together, contrary to what [Wing's counsel] says. There's no evidence of that. [Wing's counsel] says something about us not introducing any evidence of, from the house, the residence, that's because we were prohibited from doing that.

Wing's attorney objected, and a bench conference ensued. Wing argued that the State had not been prevented from introducing any evidence or testimony concerning what had been seized from Wing's house. The State maintained that it had been prevented from introducing such evidence, and opposed Wing's objection. However, the District Court granted Wing's objection and held that the State's comments to the jury regarding pretrial orders issued by the District Court were improper. The District Court then gave the jury the following cautionary instruction:

Ladies and gentlemen of the jury, during these proceedings the Court has made certain pretrial rulings, those pretrial rulings are of no concern to you during your deliberations, so you must disregard any comment by counsel in their closing argument regarding those pretrial rulings.

¶19 During deliberations, the jury requested and received the audio tape recording made by Arrowood during the controlled buy. The tape contained a written notation indicating that it also had a recorded conversation between Arrowood and Helen. This portion of the audio tape recording was never admitted into evidence. In this conversation, which took place at Helen Wing's house, Arrowood stated that he hoped that Wing had only been arrested for a misdemeanor, and Helen responded that she did not know. Arrowood also explained that after Wing's arrest, he went to his room and destroyed all of his drugs and paraphernalia. This contradicted Dennis Wing's earlier testimony that Arrowood had offered him drugs the day after his father's arrest. Arrowood also pressed Helen to get rid of everything in her house. Helen responded that she did not have anything drug related in her house. Wing's trial counsel did not make any attempt to prevent the jury from hearing this portion of the tape recording.

¶20 After deliberating, the jury convicted Wing on all seven counts. He was sentenced to a combination of concurrent and consecutive sentences totaling thirty-five years in the Montana State Prison, with ten years suspended. Wing now challenges his conviction in the District Court, and raises four issues on appeal. We state the issues on appeal as follows:

¶21 **Issue One:** *Did the District Court err in denying Wing's motion to suppress the evidence seized pursuant to the search warrant?*

11

¶22    **Issue Two:** *Did the State violate Wing's constitutional rights to due process by commenting about other acts and evidence which were outside the scope of the charges contained in the Information?*

¶23    **Issue Three:** *Was Wing's constitutional right to effective assistance of counsel violated when his trial counsel permitted the entire contents of the audiotape exhibit to go to the jury in its deliberations?*

¶24    **Issue Four:** *Did the District Court violate Wing's rights against double jeopardy under Article II, Section 25 of the Montana Constitution and the Fifth Amendment to the United States Constitution in sentencing him under Counts II and III of the Information?*

**STANDARD OF REVIEW**

¶25    We review a district court's denial of a motion to suppress to determine whether its findings of fact are clearly erroneous and whether its interpretation and application of the law is correct. *State v. Bieber*, 2007 MT 262, ¶ 20, 339 Mont. 309, ¶ 20, 170 P.3d 444, ¶ 20. We review a district court's decision whether to grant or deny a motion for a mistrial for an abuse of discretion. *State v. Flores*, 1998 MT 328, ¶ 12, 292 Mont. 255, ¶ 12, 974 P.2d 124, ¶ 12. A district court's denial of a motion for a mistrial is entitled to deference on appeal, and will not be second-guessed. *State v. Novak*, 2005 MT 294, ¶ 25, 329 Mont. 309, ¶ 25, 124 P.3d 182, ¶ 25. Moreover, because a mistrial is an exceptional remedy, remedial action short of a mistrial is preferred unless the ends of justice require otherwise. *Novak*, ¶ 26.

12

¶26 Ineffective assistance of counsel claims constitute mixed questions of law and fact which we review de novo. *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, ¶ 9, ___ P.3d ___, ¶ 9.

## DISCUSSION

¶27 **Issue One:** *Did the District Court err in denying Wing's motion to suppress the evidence seized pursuant to the search warrant?*

¶28 The District Court denied Wing's motion to suppress, concluding that the search warrant issued by Justice of the Peace Hartsock was supported by sufficient facts for a finding of probable cause. The affidavit in support of the search warrant contained information concerning the following: (1) Wing's residence and the white Cadillac; (2) Wing's prior convictions for drug possession; (3) information about alleged past sales of drugs by Wing; (4) information supplied by Arrowood concerning Wing's methods of storing, procuring, and selling drugs; and (5) a narrative account of Arrowood's alleged controlled purchase of drugs from Wing at the Stockman Bar, and Wing's subsequent arrest. Wing challenges the sufficiency of the search warrant in several respects. In particular, Wing asserts that the information concerning his former drug convictions and alleged drug sales was stale, and that Arrowood's reliability as a CI was not established.

¶29 We use the "totality of the circumstances" test as set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317 (1983), to determine whether the issuance of a search warrant was supported by probable cause. *Barnaby*, ¶ 29. We described this standard in *Barnaby* as follows:

> Under the totality of the circumstances test, the issuing judicial officer must make a practical, common sense determination, given all the evidence

contained in the application for a search warrant, whether a fair probability exists that contraband or evidence of a crime will be found in a particular place.

An application for a search warrant must state facts sufficient to show probable cause for the issuance of a warrant. A determination of probable cause does not require facts sufficient to make a showing of criminal activity, rather, the issuing judicial officer must only determine that there exists a probability of criminal activity. Probable cause must be determined solely from the information contained within the four corners of the search warrant application. Our function as a reviewing court is to ensure ultimately that the issuing judicial officer had a "substantial basis" to determine that probable cause existed.

*Barnaby*, ¶¶ 29-30 (citations omitted).

¶30 Even assuming arguendo that Arrowood's reliability as a CI was not sufficiently established under *Reesman*, and that the information concerning Wing's previous convictions and alleged past drugs sales was stale, the four corners of the search warrant did provide a "substantial basis" for the issuing judicial officer to determine the existence of a probability that Wing was engaging in criminal activity, and that evidence of this activity would be found in the Cadillac and his house. The search warrant contained a narrative account of Arrowood's alleged controlled purchase of drugs from Wing and Wing's subsequent arrest. Wing does not argue that this purchase was illegal or that it was improperly conducted by law enforcement officials. We conclude the warrant application provided facts sufficient to show probable cause that a crime was occurring, and thus supported the issuance of the search warrant. Therefore, the District Court did not err in denying Wing's motion to suppress.

¶31 **Issue Two:** *Did the State violate Wing's constitutional rights to due process by commenting about other acts and evidence which were outside the scope of the charges contained in the Information?*

14

¶32 During opening arguments, the prosecution told the jury that Brown bought "some" of the drugs which she purchased from Wing during the time frames described in the Information. (*See* ¶ 13.) Wing moved for a mistrial on the basis of these comments, and the District Court denied the motion. (*See* ¶ 14.) During closing arguments, the prosecution then referred to the fact that it was prohibited from introducing evidence seized from Wing's house by virtue of previous rulings by the District Court. Wing objected, and the District Court gave the jury a cautionary instruction. (*See* ¶ 18.) Wing now asserts that the efficacy of this cautionary instruction is in doubt. Wing asserts that, when combined with the prosecutor's statements during opening arguments, the jury was left with the impression that the State had more evidence against Wing which it was not allowed to present, which in turn contributed to his conviction.

¶33 The burden is on the defendant to demonstrate that a "prosecutor's improper comments prejudiced his or her right to a fair and impartial trial. In determining whether prejudice resulted, the improper comments must be viewed in the context of the case in its entirety." *State v. Gladue*, 1999 MT 1, ¶ 27, 293 Mont. 1, ¶ 27, 972 P.2d 827, ¶ 27 (citations omitted). Moreover, "an error in the admission of evidence may be cured if they jury is admonished to disregard it." *State v. Walker*, 280 Mont. 346, 353, 930 P.2d 60, 64 (1996).

¶34 Wing has failed to demonstrate that the prosecutor's improper comments prejudiced his right to a fair and impartial trial. In the first instance, the District Court did not abuse its discretion in denying Wing's motion for a mistrial during the

15

prosecution's opening remarks. The District Court explained that the "some of those drugs" comment by the prosecution was referring to the acts of the witness Brown, and did not construe them as referring to other acts of Wing. Secondly, the curative instruction given by the District Court in response to the prosecutor's comments during closing arguments sufficiently admonished the jury to disregard the prosecutor's comments on the pretrial rulings. As we noted in *State v. Partin*, 287 Mont. 12, 22, 951 P.2d 1002, 1008 (1997), we consider the effect of a cautionary instruction in light of the other evidence presented against the defendant. Here, the search warrant was supported by probable cause and led to a lawful seizure of a significant amount of evidence. Moreover, after the District Court issued this instruction, Wing did not object further or move for a mistrial. Under these circumstances, we conclude the District Court did not err in denying Wing's motion for a mistrial, and that any prejudicial effect the prosecution's comments during closing arguments may have had on the jury was cured by the cautionary instruction issued by the District Court.

¶35 **Issue Three:** *Was Wing's constitutional right to effective assistance of counsel violated when his trial counsel permitted the entire contents of the audiotape exhibit to go to the jury in its deliberations?*

¶36 Wing maintains that his trial counsel violated his right to effective assistance of counsel under the Sixth Amendment to the U.S. Constitution, and Article II, Section 24 of the Montana Constitution, when it allowed the entire contents of the audiotape exhibit to be heard by the jury. Wing notes that the tape included a conversation between Wing's wife Helen and Arrowood. However, Helen did not testify at trial, nor was

16

Arrowood cross-examined concerning this conversation. Because of this, Wing argues he was denied his constitutional right to confront the witnesses against him.

¶37 Further, Wing argues the contents of the audiotape prejudiced him. On the audiotape, Arrowood and Helen discussed Wing's arrest. Arrowood stated that he hoped Wing was just arrested for a misdemeanor. Helen stated that she did not have anything drug related in her house. Arrowood urged Helen to get rid of anything in her house, and Helen reiterated that she did not have any illegal drugs. Wing argues that these statements from Helen contradicted his defense that the drugs found in the white Cadillac belonged to her instead of Wing. Additionally, Arrowood stated that he had got rid of all his drugs and paraphernalia after Wing's arrest. This contravened testimony from Dennis that Arrowood offered him marijuana the day after the arrest. Wing claims his argument is supported by *State v. Parker*, 2006 MT 258, 334 Mont. 129, 144 P.3d 831.

¶38 The State maintains that Wing's ineffective assistance of counsel claims are not record based and thus can only be raised in a petition for postconviction relief. Additionally, the State argues that even if Wing's claims are reviewable, they fail because he has failed to demonstrate how the admission of the audiotape has prejudiced him. The State points out, in the first instance, that it was Wing who admitted the audiotape into evidence. Assuming that the jury listened to the whole audiotape and was able to discern the conversation between Helen and Arrowood, the State points out that neither party implicates Wing in drug activities, nor is there any mention of the white Cadillac on the tape. Instead, Helen only states that she does not have any drugs in her house.

17

¶39 The State further argues that the audiotape did not prejudice Wing when weighed against the totality of the evidence. The State asserts it presented sufficient evidence to contradict Wing's theory that the drugs in the Cadillac belonged to Helen, including the fact that Wing commonly drove the white Cadillac, that his fingerprints were on baggies of marijuana and a digital scale seized in the Cadillac, and that Wing's name appeared on a prescription pill bottle seized from the white Cadillac which contained methamphetamines. Furthermore, the State argues that *Parker* is distinguishable.

¶40 In *Parker,* defendant Parker was tried and convicted of felony assault with a weapon, based on injuries he allegedly inflicted against his wife and son. During trial, the State admitted into evidence taped interviews with Parker's children which implicated him in the assault. However, Parker's children recanted their testimony at trial, stating that they could not remember details of the events, or had been forced by an adult houseguest who was staying at their house named Eve Kratz (Kratz) to make false statements to the police. *Parker*, ¶¶ 5-6. Kratz herself did not testify at trial.

¶41 The audiotape containing the taped interviews was delivered to the jury during deliberations. Unbeknownst to Parker, however, the audiotape also contained a recorded statement made by Kratz, which was not admitted into evidence during the trial, and which apparently contradicted Parker's claims that Kratz intimidated the children into giving false statements. *Parker*, ¶ 9. Parker argued that the interview with Kratz struck at the heart of his defense, because he had argued during trial that his children initially gave false statements to the police under pressure and intimidation from Kratz. *Parker*, ¶ 16. Parker argued that the consideration of this audiotape by the jury violated his

18

constitutional right to confront the witnesses against him, because he was denied the opportunity to cross examine Kratz or challenge her credibility as a witness.

¶42     In analyzing Parker's claims, we concluded that the delivery of the tape to the jury was a trial error, as opposed to a structural one, and applied harmless error analysis to Parker's claim. *Parker*, ¶ 23. In order to asses the impact of the evidence, we examined whether or not the audiotape was cumulative. We considered whether the jury was presented with other evidence that proved the same facts as the tainted evidence, and whether the State could prove that the quality of Kratz's statement was such that there was no reasonable probability it might have contributed to Parker's conviction. *Parker*, ¶ 24. We concluded that consideration of the audiotape was not harmless error. We noted that because Kratz was not subject to cross examination, a consideration of the audiotape essentially gave the jury a one-sided version of events to the State's advantage and Parker's detriment. *Parker*, ¶ 26. Given the fact that no one witness could corroborate the events that occurred, Kratz's statement was at least as crucial to the prosecution's case as the statements of family members and of superior quality to other evidence presented at trial.

¶43     We agree with the State that *Parker* is distinguishable. Because Wing presents an ineffective assistance of counsel claim, he must prove that (1) his counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced him. *Whitlow*, ¶ 10. Under the first prong of this test, Wing must show that his "counsel's conduct fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." *Whitlow*, ¶ 20. Under prong two,

"[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984).

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96, 104 S. Ct. at 2069.

¶44 Assuming that the performance of Wing's trial counsel was deficient in allowing the taped conversation between Arrowood and Helen to be heard by the jury, we cannot say that, but for this error, the result of Wing's trial would be different. The case against Wing was supported by a substantial amount of evidence seized in the white Cadillac. Moreover, the State established that he drove the Cadillac, and that he had handled some of the drugs in the car. It was also established that Wing drove the Cadillac on that day. Unlike the audiotape in *Parker*, the audiotape in Wing's case could only have had a peripheral effect on the strength of his defense. Had Helen directly implicated Wing, or stated that the drugs in the white Cadillac were not hers, then Wing's claims of prejudice might have more merit. However, Helen stated only that she herself did not have drugs

20

in her house, and she made no statements regarding the ownership of the drugs in the white Cadillac. Further, Wing has failed to show how establishing the falsity of Arrowood's statements that he got rid of all his drugs would have resulted in a different outcome of the case, especially in light of the amount of evidence presented by the State.

¶45 **Issue Four:** *Did the District Court violate Wing's rights against double jeopardy under Article II, Section 25 of the Montana Constitution and the Fifth Amendment to the United States Constitution in sentencing him under Counts II and III of the Information?*

¶46 Wing argues that the District Court violated his double jeopardy rights under Article II, Section 25 of the Montana Constitution and the Fifth Amendment to United States Constitution. In particular, Wing asserts that the two counts concerning the possession of dangerous drugs and the two counts concerning the criminal possession of dangerous drugs with intent to distribute involved the same drugs and that punishment for a conviction under all these counts would unconstitutionally permit multiple punishments for the same offense. On appeal, the State, while not addressing the propriety of plain error review or the merits of the double jeopardy claim, agrees with Wing's request to remand. Thus, we remand this case to the District Court with instructions to vacate Wing's convictions under Counts II and III, and re-sentence him in accordance with the remaining convictions.

## CONCLUSION

¶47 We affirm the District Court's denial of Wing's motion to suppress. We further conclude that Wing's constitutional rights to due process and effective assistance of counsel were not violated in the course of his trial. However, we remand this case to the

21

District Court to vacate Wing's convictions on Counts II and III and re-sentence him accordingly.

/S/ PATRICIA COTTER

We concur:

/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶48     I join in the Court's opinion on issues one through three.  I concur in the Court's resolution of issue four, but respectfully dissent from the Court's approach to the issue. I would apply common law plain error review, reverse the District Court on the merits of the double jeopardy issue, and remand—as the Court does—for re-sentencing.  I would not allow the State to put a District Court in error by agreeing with Wing's "remedy," without having been bothered to address the propriety of plain error review or the merits of the double jeopardy claim.

¶49     District court decisions are presumed to be correct and the appellant bears the burden of establishing error.  *See e.g. State v. Gomez*, 2007 MT 111, ¶ 33, 337 Mont. 219, ¶ 33, 158 P.3d 442, ¶ 33; *State v. Harville,* 2006 MT 292, ¶ 12, 334 Mont. 380, ¶ 12, 147 P.3d 222, ¶ 12.  At a minimum, I believe the State owes Montana's trial courts sufficient respect to either support decisions on the merits or concede the validity of an

appellant's substantive arguments. I understand the Court's willingness to follow the procedure offered by the State here. Our workload is enormous and, as is well known, we are unable to remain current in deciding the cases before us. It is my view, though, that the State's and, now, the Court's approach cheapens the administration of justice in Montana and shows disrespect for our trial judges. The district courts do not deserve such treatment.

¶50 If, in the State's view, a trial court has made a legal error in analyzing something as important as constitutional double jeopardy protections, the State should concede the issue on the merits so that law is established. If not, the State should present legal argument and authority in support of the decision which is presumed to be correct.

¶51 We are all conscious of doing our work timely. We also are conscious of doing quality work. These two critical aspects of the administration of the criminal justice system are in daily tension. As already mentioned, this Court is not current. The same is true of the Appellate Bureau of the Office of the Attorney General, which seeks significant numbers of extensions of time to file the State's briefs in criminal appeals. In my opinion, however, the "answer" to this tension between time and quality—whatever it *may* be—*cannot* be to simply throw district court decisions to the wolves in such a casual way as this.

¶52 I have an additional concern. A process whereby the State can just agree with an appellant's remedy, without addressing the issues presented on the merits, may well allow the State to "cherry pick" issues and control outcomes without the necessity of doing much substantive work. The potential result, I fear, is that this Court will end up

writing precedential opinions in criminal appeals only in cases in which the State is confident it will prevail. This result would literally stand the administration of justice on its head.

¶53 I dissent from the Court's approach to the fourth issue. I join it in remanding this case to the District Court for resentencing.


/S/ KARLA M. GRAY


Justice James C. Nelson concurs.

¶54 While I join the Court's Opinion, I also join Chief Justice Gray's comments at ¶¶ 2-5 of her Concurrence and Dissent. If all or part of either the defendant's or the State's argument on appeal is meritorious, then a concession is in order from the other party; if it is not, then the opposing argument should be made. It benefits no one—neither the parties nor the courts—to brief and decide issues that are without merit. The obligation for every lawyer to seek—and, in my view, to acknowledge—the truth is not limited to the practice of civil law.


/S/ JAMES C. NELSON