No. 96-694

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 107

STATE OF MONTANA,

Plaintiff and Respondent,

v.

CLYDE ALLEN JOHNSON,

Defendant and Appellant.

APPEAL FROM:   District Court of the Twenty-First Judicial District,

In and for the County of Ravalli,
Honorable Jeffrey H. Langton, Judge Presiding.

COUNSEL OF RECORD:

For Appellant:

William F. Hooks, Appellate Defender, Helena, Montana; J. G.
Shockley (argued), Victor, Montana

For Respondents:

Honorable Joseph P. Mazurek, Attorney General; Jennifer
Anders (argued),Assistant Attorney General, Helena, Montana; George H. Corn,
County Attorney, Hamilton, Montana

Heard:   February 17, 1998
Submitted:   February 26, 1998
Decided:    May 5, 1998

Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

¶1    In a Ravalli County jury trial before the Twenty-First Judicial District Court, Clyde Allen Johnson was convicted of three counts of sexual intercourse without consent.  He appeals.  We affirm.

¶2    The issues are:

¶3    1.  Did the District Court abuse its discretion when it precluded Johnson from cross-examining the victim or offering other evidence of her prior sexual conduct with other men?

¶4    2.  Did the court err in admitting the annotated transcription of an interview of the victim by the investigating officer?

¶5    3.  Did the court err in granting the jury's request for a copy of the annotated transcription during deliberations?

¶6    Clyde Allen Johnson spent the afternoon of May 23, 1994, at Chaffin Motor in Hamilton, Montana, helping the owner of the business, Chad Chaffin, and two other men, Brad Grenfell and Jay Bier, put an engine in a truck.  A 28-year-old woman, the victim in this case, was also working at Chaffin Motor that day, "detailing" another truck to prepare it for sale.  The victim and Johnson had not met before, although he had seen her around town.

¶7    As they worked, they all drank beer and talked about fishing.  At the end of the afternoon, the victim asked Chaffin for a ride home.  Chaffin told her he would take her home when he finished putting the engine in the truck.  She decided not to wait and began walking.  As she was walking on the left side of the highway, Johnson's car pulled up behind her in the wrong lane of traffic, and he offered her a ride.  She agreed, getting into the car quickly because of oncoming traffic.

¶8    The trial testimony of Johnson and the victim differed as to what happened next.  The victim testified that she gave Johnson directions to the house where she lived with her boyfriend and his mother.  She noticed that Johnson was not following her directions and at first thought he must have had an errand to run in town.  However, when she mentioned that he was going in the wrong direction, he sped up and told her that he wanted to "party."  When she told him that she wanted to go home, he leaned very close and said repeatedly, "I'm going to fuck you."  The victim told Johnson that she did not want to "party" and that she needed to get home for dinner or her boyfriend would wonder where she was.  Johnson proceeded to drive several miles out of town, up to the Canyon Creek trail head.

¶9    Johnson testified, in contrast, that after the victim got into his car, they agreed to go fishing.  Because neither of them had a fishing license and because the victim did not want her boyfriend to know what she was doing,

they decided to fish at the somewhat remote Canyon Creek trail head.

¶10  At the trail head, Johnson and the victim got out of his car and walked toward the  nearby creek.  The victim testified that Johnson was holding her tightly by the arm and that she was trying to make conversation to "keep him calm."  A couple visiting Montana from New Hampshire walked past them on the short trail to the creek.  The woman from New Hampshire heard the victim nervously ask Johnson if he wanted her to tell him her whole life story. Johnson said, "Howdy" to the couple, but the victim did not speak to them, and she testified that she did not even see them.

¶11  According to the victim, after she and Johnson got to the creek, she suggested that they go back to town and get her fishing pole, hoping that this would give her an opportunity to escape.  Johnson instead went back to his car and got his fishing pole.  The victim testified that she did not believe she had time to escape while he was at his car.  When he returned, they fished briefly. Johnson then led her to a spot near the trail, pushed up her t-shirt and bra, and pushed her shorts and panties down.  She left one leg in her shorts in preparation for escape.  Johnson forced her to engage in three separate acts of sexual intercourse with him, and attempted a fourth, anal intercourse, on the ground near the creek.  She testified that she did not actively fight back because she was afraid to provoke a violent physical response from him.

¶12  Johnson testified, in contrast, that their acts of sexual intercourse near the creek were consensual and did not include attempted anal intercourse.  He testified that after they fished, they kissed for awhile.  Then the victim took him by the hand and led him up the trail, where she sat down and pulled her pants and panties down.  He laid down beside her and they proceeded to have intercourse.  He testified that when they finished having sex, the victim got up and walked away; he believed she was just going back to his car.

¶13  The victim testified that at the first opportunity she saw, she got up from the ground and ran away.  The couple from New Hampshire saw her bolt past them in the parking area, again not appearing to notice them, and then run right off the road over an embankment.  The couple became convinced that something was wrong.  At that point, Johnson came down the trail and asked if they had seen the victim.  They said "no" and directed Johnson off into the woods (the wrong way) to look for her.

¶14  The man from New Hampshire got into his van and drove down the road in the direction the victim had gone.  After he drove around several curves, the man heard thrashing in the underbrush and then the victim reemerged onto the road.  He stopped the van and called out, "I'm here to help you," to which she replied, "Thank God, thank God, thank God for you, you're an angel, you saved me."  She got into the van and hid in the back.  The man asked if Johnson was armed, and the victim replied, "Only with his dick."

¶15  The man then went back to the trail head and asked his companion to take the victim to get the police.  Johnson reappeared and said he was going to go get the victim's brother to help look for her.  Johnson then left in his car, returning with Grenfell, who was not a brother of the victim.  Two Ravalli

County sheriff's officers arrived shortly thereafter and arrested Johnson.

¶16  At the jury trial, the victim, Johnson, and the couple from New Hampshire testified, as did Chaffin, Grenfell, and the investigating officers. The doctor who examined the victim after the incident testified that her vagina was packed with forest debris, and that she had a "fairly flat" and "unemotional" affect, not unusual in a person who had undergone trauma and abuse. The doctor testified that the victim did not appear to be drunk so he did not test for alcohol content in her blood.

¶17    The jury convicted Johnson of three counts of sexual intercourse without consent and acquitted him of the fourth count, attempted anal sexual intercourse without consent.  He appeals.

Issue 1

¶18  Did the District Court abuse its discretion when it precluded Johnson from cross-examining the victim or offering other evidence of her prior sexual conduct with other men?

¶19  Montana's rape shield statute, § 45-5-511, MCA, provides in relevant part:

> (2)  No evidence concerning the sexual conduct of the victim is admissible in prosecutions under this part except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease which is at issue in the prosecution.

The statute, enacted in 1973, "reflects a compelling interest in favor of 'preserv[ing] the integrity of the trial and . . .  prevent[ing] it from becoming a trial of the victim.'"  State v. Anderson (1984), 211 Mont. 272, 283, 686 P.2d 193, 199.  In reviewing a trial court's decision regarding the admissibility of evidence relating to extrinsic sexual activity of an alleged victim of sexual assault under the rape shield statute, this Court determines whether the lower court abused its discretion.  State ex rel. Mazurek v. Dist. Court of Fourth Jud. Dist. (1996), 277 Mont. 349, 353, 922 P.2d 474, 477.

¶20  Johnson argues that the rape shield statute may not automatically be applied to exclude evidence of the complainant's sexual activity not within the enumerated exceptions.  He asserts that is exactly what happened here, in violation of his rights to due process and to confront the witnesses against him as guaranteed under the Sixth Amendment to the United States Constitution. He maintains that the victim's prior sexual activity was a factor which, if developed at trial, would have established her motive to lie and to claim a lack of consent.  Amicus curiae Montana Association of Criminal Defense Lawyers joins Johnson's argument, advocating that a constitutional catch-all provision is necessary in the statute to protect defendants' constitutional rights.

¶21  Johnson points out that the United States Supreme Court has struck down state evidentiary rules which arbitrarily or mechanistically operated to exclude evidence material and relevant to the defense.  See Washington v.

Texas (1967), 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (striking a statute which prohibited persons charged as accomplices from testifying for each other as an arbitrary denial of the right to present evidence relevant and material to the defense); Chambers v. Mississippi (1973), 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297, 313 ("where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice"); Rock v. Arkansas (1987), 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (restrictions on the right to testify may not be arbitrary or disproportionate to the purposes which they are designed to serve).

¶22  However, the Court has recently reaffirmed that a defendant's right to present relevant evidence under the Fifth and Sixth Amendments is not unlimited, but rather is subject to reasonable restrictions.  In United States v. Scheffer (1998), ___ U.S. ___, 118 S.Ct. 1261, ___ L.Ed.2d ___,  the Court upheld a per se rule against admission of polygraph evidence in court martial proceedings.  In so doing, the Court restated that state and federal rules excluding evidence from criminal trials do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.  Scheffer, 118 S.Ct. at 1264.

¶23  This Court has recognized that the bar imposed by Montana's rape shield statute is not absolute.  The statute allows narrowly-drawn exceptions to the exclusion of evidence of a complainant's sexual conduct. "[T]he policy is not violated or circumvented if the offered evidence can be narrowed to the issue of the complaining witness' veracity."  Anderson, 211 Mont. at 284, 686 P.2d at 200, citing Hall v. State (Ind. App. 1978), 374 N.E.2d 62.  At the same time, this Court recently noted that it has "consistently upheld the exclusion of prior sexual conduct evidence rejecting claims that the Sixth Amendment of the United States Constitution and Article II,   24 of the Montana Constitution guarantee the defendant the right to introduce such evidence." Mazurek, 277 Mont. at 354, 922 P.2d at 478.

> We have held that the Sixth Amendment right of confrontation
> is not absolute and that the Rape Shield Law serves a compelling
> state interest in preventing rape trials from becoming trials
> on the prior sexual conduct of the victims.  In balancing the
> rights of victims and the rights of the defendant we have stated
> that:  "The Sixth Amendment is not absolute, and 'may bow to
> accommodate other legitimate interests in the criminal trial
> process.'  The rape shield statute has been upheld as a legitimate
> interest justifying curtailment of the constitutional right to
> confront witnesses."

Mazurek, 277 Mont. at 354-55, 922 P.2d at 478 (citations omitted).

¶24  The constitution does not require a blanket exception to rape shield statutes for all evidence related to motive to fabricate.  Speculative or unsupported allegations are insufficient to tip the scales in favor of a defendant's right to present a defense and against the victim's rights under the rape shield statute.  See State v. Rhyne (1992), 253 Mont. 513, 521, 833 P.2d 1112, 1118; State v. Fitzgerald (1989), 238 Mont. 261, 263-64, 776 P.2d 1222,

1223-24; State v. Laird (1987), 225 Mont. 306, 310, 732 P.2d 417, 420.

¶25  In a pretrial motion, Johnson proposed to introduce evidence that the victim was cohabitating with her boyfriend at the time of the rape and that she had a crush on Chad Chaffin.  Johnson's counsel further alleged in that motion, "A fact not known to Mr. Johnson at the time, liaisons with other men had on more than one occasion caused [the victim's boyfriend] to leave [the victim]." The defense alleged that these matters were relevant to show that the victim had a motive to lie in order to prevent her boyfriend and Chaffin from finding out about what the defense alleged was consensual sex.  The court denied the motion, ruling that the defense's theories had been presented "without offer of proof establishing a significant factual basis."

¶26  The only specific allegations made by the defense in its initial motion were that the victim had had sexual relationships with her boyfriend and with Chaffin.  The court allowed considerable testimony concerning those two relationships.

¶27  As part of the evidence submitted for the jury's consideration, the court allowed the defense to elicit the victim's admissions that she had told Johnson she was in love with Chaffin and that she had a crush on him.  The defense also elicited the victim's testimony that at the time of the rape, she and her boyfriend (not Chaffin) were planning on getting married and that they were living together.  The court further allowed the defense to ask the victim whether, on the afternoon of the rape, she told Johnson that she had to get home or her boyfriend would be mad, which she admitted.  The defense questioned the victim as to why she did not scream during the rape, why she did not run away sooner, and whether she had made a statement in the transcription that she "pretended [she] liked part of it [the sexual intercourse with Johnson]."

¶28  The court allowed Johnson to testify that the victim was "obsessed with" Chaffin and upset that he was not paying attention to her.  The court also allowed Johnson to testify that he and the victim decided to go fishing up Canyon Creek so that her boyfriend would not find out.  Finally, Johnson was allowed to testify at length that the acts of sexual intercourse between him and the victim were consensual.

¶29  In short, the court allowed extensive testimony relating to the defense theory concerning a motive to lie on the part of the victim.  All of this belies the defense's allegation that the jury was not permitted to consider the victim's statements in context of the defense theory that she was making up the complaint to cover up an incident of consensual sexual intercourse.

¶30  The defense raised its motion to introduce evidence twice more--in an offer of proof on a motion for reconsideration of the court's ruling on the initial motion, and on the morning of trial.  Immediately before trial, counsel for the defense made an offer of proof in which he referred to an August 1994 statement by Chaffin, which had been taped and transcribed.  The defense further alleged that Chaffin, Chaffin's sister, and Grenfell would all say that the victim had been thrown out by her boyfriend because of her sexual

misconduct with other people.  However, the defense did not submit any support for these allegations.

¶31  At oral argument before this Court, the State pointed out that the sole apparent basis for Johnson's claim that prior liaisons between the victim and other men had caused her boyfriend to break up with her was a transcript of a taped interview with Chaffin in August 1994, several months after the rape. In that interview, Chaffin stated that the victim was no longer living with her boyfriend, but had lived by herself for "two weeks . . . or so" because "she went on one of her little flings . . . [the boyfriend] found out . . . and kicked her out[.]"

¶32  This statement by Chaffin does not speak to anything which could have provided a motive for the victim to lie at the time of the rape.  The event to which he referred occurred "two weeks . . . or so" before his statement was made, which was several months after the rape.  The defense did not include Chaffin's interview statement as part of its offer of proof.  A copy of the statement, which was not introduced into evidence,  is in the exhibit file.

¶33  The defense claims it was denied the opportunity to interview the victim and her boyfriend until the last minute.  It did not, however, raise this point during the year and a half in which this case was pending, but only on the morning of trial.  We note that the defense was provided the services of a private investigator and did not complain until the day of trial that it was in any way unable to prepare its case.

¶34     Johnson himself acknowledges that a limitation, without a blanket prohibition, may be proper as to evidence of the victim's alleged motive to lie. After reviewing the record, we conclude that this case does not present an example of a blanket application of the rape shield statute as to evidence related to motive to fabricate.  We conclude that the facts alleged and about which questioning was not permitted were speculative and unsupported, and are therefore insufficient to tip the scales in favor of Johnson's right to present a defense and against the victim's rights under the rape shield statute.  We hold that to the extent the District Court denied the defense's motions to present evidence of the victim's prior sexual conduct and her relationships with other men, that denial was not an abuse of discretion and violated neither Johnson's right to due process nor his right of confrontation.
                              Issue 2

¶35  Did the court err in admitting the annotated transcription of an interview of the victim by the investigating officer?

¶36  The admissibility of evidence is a discretionary ruling, and this Court determines whether the trial court abused its discretion by admitting disputed evidence.  State v. Ahmed (1996), 278 Mont. 200, 206-07, 924 P.2d 679, 683.

¶37  At trial, the defense cross-examined the victim about an interview which Detective Zerbst had conducted with her on the evening of the rape. Referring to a transcription of that interview, counsel attempted to impeach the victim's trial testimony with statements she had made to Detective Zerbst.  The

defense also cross-examined Detective Zerbst using the transcription of the interview.

¶38 It became apparent during this cross-examination that the transcription to which defense counsel was referring was not the same transcription in the possession of the State--the defense's copy contained additional handwritten comments, beginning at page 2. Out of the jury's presence, the court and counsel determined that the copy in the defense's possession was one on which the victim had added handwritten changes and additions. The prosecuting attorney had given the victim a copy of the transcription, asking her to add to it or correct it as she saw necessary. When the victim returned her annotated copy to the county attorney's office, the office was closed, and she merely slipped it under the door. When the annotated copy was found, it was believed to be identical to the original, and was later mistakenly provided to the defense as part of discovery. The State did not realize until during cross-examination that the victim had made handwritten notes on a copy of the transcription and that defense counsel had been given that copy.

¶39 The State proposed that because the victim had already been cross-examined on parts of her transcribed and annotated statement, the statement should be allowed into evidence under Rule 801(d)(1), M.R.Evid., as either a prior consistent or prior inconsistent statement. Defense counsel argued that the statement as a whole was inadmissible hearsay. The court reserved a ruling on the admissibility of the annotated transcription, but the parties agreed to examine the victim to explain to the jury the confusion over the two different transcriptions.

¶40 During further cross-examination, the defense specifically questioned the victim about her handwritten statement on page 9 of the transcription that, "I pretended I liked part of it  I went back and forth." The victim confirmed that this was her handwriting and that it was a true statement. On redirect, she clarified that going "back and forth" did not describe her physical movements with Johnson, but instead described how she felt mentally, i.e., "making him think I liked it for a little bit, but then I'd get angry and I'd burst out with verbal abuse."

¶41 During closing arguments, both sides again addressed the victim's statement to Detective Zerbst and her annotations on the transcribed copy of that statement. The prosecutor argued that despite defense counsel's attempts to impeach the victim with some of the statements, her trial testimony was not "that inconsistent" with either her original or annotated statement. In his closing, defense counsel played up the "back and forth" language which the victim had handwritten in her statement, saying, "Take that in context, folks. She was talking about her body and Mr. Johnson's body." He argued that the sexual intercourse in which Johnson admittedly engaged with the victim was consensual, or if not consensual, not knowingly nonconsensual to Johnson, because the victim was acting as if she liked it.

¶42 The issue of the admissibility of the annotated transcription was reopened during the jury's deliberations when the jury asked to be allowed to

see the copy of the transcription "which includes [the victim's] written changes." After lengthy discussion with counsel, the court decided to admit nearly all of the annotated transcription into evidence, with the exception of a small portion at the bottom of page 3 and the top of page 4 discussing another event deemed prejudicial to Johnson. The court reasoned that based upon the arguments made in the defense's closing, "we have more reason now to put it in as a prior consistent statement than we had when it was first offered."

¶43  Rule 801(d)(1), M.R.Evid., provides that a prior statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement and the statement is either (A) inconsistent with the declarant's testimony, or (B) consistent with the declarant's testimony and offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence or motive. Johnson argues that the victim's pretrial statements were not admissible as either a prior statement consistent with her trial testimony offered to rebut a charge of subsequent fabrication, or as a prior inconsistent statement.

¶44  The court allowed the statement as a prior consistent statement under Rule 801(d)(1)(B), M.R.Evid. As to that subsection, Johnson maintains that he did not allege a subsequent fabrication of the story, but that the victim fabricated her story all along. He cites Tome v. United States (1995), 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574. In Tome, the Court interpreted Fed. R. Evid. 801(d)(1)(B), which is different from Rule 801(d)(1)(B), M.R.Evid. Johnson also points out, however, that this Court has interpreted Rule 801(d)(1)(B), M.R.Evid., to mean that "if a defendant does not assert that the victim is subsequently fabricating her story, but claims, as in this case, she was lying all along, prior consistent statements are not admissible." State v. Lunstad (1993), 259 Mont. 512, 517, 857 P.2d 723, 726.

¶45  In this case, the prior statement in the annotated transcription may have had general impeachment value to the defense, but our review of that statement convinces us that nothing in it supported Johnson's theory that the victim was concocting the rape to hide her promiscuity from others. The prior statement thus provided no independent basis for defense counsel to question the victim about a "motive to lie all along," but was relevant only to suggest that the victim's overall credibility was suspect because of her various statements concerning the rape.

¶46  The annotated statement was initially brought before the jury by the defense, for purposes of impeachment. The defense attempted to use the annotated transcription as a prior inconsistent statement by the victim. Under that argument, the annotated transcription would have had to predate the motive to lie. But, as the District Court noted, the victim's statements in the annotated transcription proved to be fairly consistent with her trial testimony. A prior consistent statement which predates the motive to lie is admissible into evidence. Therefore, we conclude that the State was thereafter entitled to utilize the statement as a prior consistent statement to rehabilitate the witness, and the annotated transcription was admissible under Rule 801(d)(1)(B), M.R.Evid.

¶47 Finally, it is disingenuous for Johnson to argue that the annotated transcription is a prior statement that could not be used by the State for its substantive value. Johnson himself relied upon the annotated statement as substantive evidence that the victim went "back and forth," implying that the victim was consenting to sex.

¶48 We hold that the District Court did not abuse its discretion in admitting the annotated transcription into evidence.

Issue 3

¶49 Did the court err in granting the jury's request for a copy of the annotated transcription during deliberations?

¶50 Section 46-16-503(2), MCA, allows a Montana court to refresh the jury's recollection of trial testimony under certain limited circumstances:

> After the jury has retired for deliberations, if there is any disagreement among the jurors as to the testimony or if the jurors desire to be informed on any point of law arising in the cause, they shall notify the officer appointed to keep them together, who shall then notify the court. The information requested may be given, in the discretion of the court, after consultation with the parties.

Johnson's objection to granting the jury's request for a copy of the annotated transcription during deliberations is based upon case law concerning jury requests to rehear trial testimony during deliberations. In such cases, this Court has held that trial courts should not furnish a transcript of the testimony of any particular witness, in order to avoid placing undue emphasis on the testimony of any one witness to the exclusion of all others. E.g., State v. Harris (1991), 247 Mont. 405, 417, 808 P.2d 453, 460. However, if a jury has "some particular reason or point" that it wants to resolve relating to the evidence, the jury may submit the question for the court's consideration. Harris, 247 Mont. at 418, 808 P.2d at 460.

> [T]he court should determine what particular testimony has caused the disagreement among the jurors. After making that determination, the court shall exercise its discretion after consultation with the parties, keeping in mind that the court must avoid undue emphasis upon particular testimony as condemned in State v. Harris.

State v. Mayes (1992), 251 Mont. 358, 374, 825 P.2d 1196, 1206.

¶51 This case is in no way analogous to Harris or Mayes. First, the ruling did not place undue emphasis on the victim's testimony to the exclusion of the other evidence. At issue were the victim's statements, made at different times, which defense counsel suggested were inconsistent with her trial testimony. Defense counsel also asked the jury to consider the annotated transcription for its substantive value, i.e., that the victim "went back and forth."

¶52 More to the point, the jury was not asking to review trial testimony, but

to review a document referenced at trial and introduced into evidence.  Section 46-16-504, MCA, allows the jury to take with it into the jury room "all exhibits that have been received as evidence in the cause that in the opinion of the court will be necessary."  Like jury requests to be allowed to review trial testimony, such requests must be decided so as to guard against the evidence being given undue weight or emphasis.  See State v. Christenson (1991), 250 Mont. 351, 361, 820 P.2d 1303, 1309.

¶53  The form of the jury's request indicated that the jury was interested in the additions and corrections the victim made to her initial statement to Detective Zerbst. The victim's handwritten corrections or additions appeared on pages 2, 4, 5, 6, 7, 8, 9, 11, and 13 of the 23-page transcription.  By admitting the majority of the annotated transcription into evidence, the court allowed the victim's statements to be placed in context.  We conclude that this was the only just result, given the manner in which the statements were used at trial and that the victim's additions and corrections appeared on multiple pages of the transcription.  The court's ruling would have aided the defense if, as the defense argued, discrepancies truly existed in the victim's statements. We hold that the District Court did not abuse its discretion in granting the jury's request to review the annotated transcription during deliberations.

¶54  Affirmed.

/S/  J. A.  TURNAGE

We concur:

/S/  JIM REGNIER
/S/  JAMES C. NELSON
/S/  KARLA M. GRAY
/S/  WILLIAM E. HUNT, SR.
/S/  W. WILLIAM LEAPHART
/S/  TERRY N. TRIEWEILER