DA 06-0040

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 389

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

LAWRENCE ROLAN LINDBERG,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-2003-519 (B)
Honorable Katherine R. Curtis, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

                Jim Wheelis, Chief Appellate Defender, Kristina Neal, Assistant Appellate
Defender, Helena, Montana

        For Appellee:

                Hon. Mike McGrath, Montana Attorney General, John Paulson, Assistant
Attorney General, Helena, Montana

                Ed Corrigan, Flathead County Attorney, Lisa A. Adams, Deputy County
Attorney, Kalispell, Montana


Submitted on Briefs:  February 28, 2007

Decided:  November 18, 2008


Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Lawrence Rolan Lindberg (Lindberg) appeals his conviction on two felony counts of sexual assault, one felony count of sexual intercourse without consent, and one misdemeanor count of sexual assault in the Eleventh Judicial District, Flathead County. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On December 23, 2003, Lindberg was charged with two counts of sexual assault and one count of sexual intercourse without consent. The circumstances leading to these charges are as follows. Lindberg began dating a woman, R.B., in 1995, and moved in with R.B.'s parents in Columbia Falls, Montana. R.B.'s son (B.B.), R.B.'s two daughters, H.B. and A.T., and another teenage boy, V.L., all lived in the home with R.B.'s parents. H.B. was approximately eleven years old at the time, and A.T. was approximately five. Lindberg and R.B. lived in the basement of the home. R.B. had a drinking problem, and she and Lindberg would regularly drink together. At Lindberg's trial, H.B. testified that the first night he moved into the house he sexually abused her when she got up to use the bathroom. H.B. claimed that Lindberg directed her into one of the bedrooms and then touched her between her legs with his hands and mouth. H.B. testified that Lindberg continued this course of conduct on a regular, sometimes daily, basis for several years, touching her both under and over her clothing. At the time these incidents were occurring, however, H.B. did not tell anyone about them.

¶3 According to A.T.'s trial testimony, Lindberg also committed similar acts against her. A.T. testified that when she was five years old she had been sitting on Lindberg's

2

lap in the basement with him and R.B. watching television. When her mother left the room, Lindberg unbuttoned A.T's pants, put his hands down her pants and rubbed her vagina area. A.T. testified that before R.B. came back into the room Lindberg warned her not to tell anyone about the incident or she would be hurt. At the time, A.T. did not tell anyone about the incident. According to her testimony, this was the only sexual act Lindberg committed against her during this time.

¶4 Around 1998, Lindberg and R.B. separated for a few years, reuniting sometime in 2000 or 2001. Sometime after Lindberg moved out of the house, A.T. allegedly told some peers about Lindberg's conduct against her, but did not relate this incident to any adults or authority figures. According to trial testimony, H.B. maintained her silence concerning Lindberg's conduct. In 2002, Lindberg and R.B. moved back into the grandparents' home, staying in B.B.'s bedroom instead of the basement, while B.B. stayed in a bed in his grandparents' bedroom. When Lindberg moved back into the home, he was working as a trucker regularly travelling out-of-state. He would be gone for periods ranging from weeks to months, and then return to Columbia Falls for a few weeks at a time. R.B. would accompany him on these trips. H.B. testified that once Lindberg returned to the home, he continued the unwanted sexual contact, grabbing her chest and trying to kiss her. H.B. told Lindberg not to do this, and Lindberg eventually left her alone. However, Lindberg allegedly resumed his sexual conduct against A.T., who was then approximately eleven years old. A.T. testified that Lindberg's sexual conduct against her was not as "bad" as the first instance several years prior, but much more consistent. A.T. claimed that Lindberg would touch and squeeze her breasts and

3

buttocks on many occasions.  A.T. testified that she attempted to avoid being alone at the house with Lindberg.  A.T. estimated that Lindberg had touched her approximately thirty times during this time period.

¶5      A.T. recounted specific instances of the alleged sexual contact to the jury during trial.  In one incident, one of A.T.'s friends, a teenage boy named M.T., allegedly witnessed sexual conduct by Lindberg against A.T.  A.T. claimed that she was in the bathroom doing her hair when Lindberg grabbed her buttocks.  M.T. apparently witnessed the incident and it bothered him to the point that he afterward told A.T. he wanted to "do something" to Lindberg with a baseball bat.  However, A.T. persuaded him not to take any action.  M.T. testified that he spoke to his mother about this incident after its occurrence.

¶6      After these incidents, A.T. told some of her close friends about Lindberg's conduct, but did not go to the authorities or tell any adults.  A.T. told V.L., the teenage male who had lived at the house and was a friend to both of the girls, about Lindberg's actions towards her.  V.L. apparently urged her to tell her grandmother, but A.T. refused to do so.  V.L. did tell H.B. about Lindberg's actions.  Upon receiving this information, H.B. then spoke directly to A.T. about the incidents and confirmed them directly with her.  H.B. then went to the police in Columbia Falls and told them about Lindberg's conduct only with respect to A.T.  The next day, H.B. brought A.T. to the police station to discuss these alleged sexual assaults against her.

¶7      The girls were first interviewed by Officer Brandy Arnoux (Officer Arnoux) of the Columbia Falls Police Department on February 2, 2003.  In the course of speaking to the

4

girls, Officer Arnoux quickly realized that the grandparents' home was outside the city limits of Columbia Falls, and contacted the Flathead County Sheriff's Office concerning the report. Deputy Bill Emerson (Deputy Emerson) of the Flathead County Sheriff's Office was soon dispatched to assist Officer Arnoux. Detective Lance Norman (Detective Norman) and Detective Jeanne Landis (Detective Landis) also of the Flathead County Sheriff's Office assisted in the investigation as well. Once Deputy Emerson arrived, the girls were given written statement forms to fill out.

¶8    In the course of their interview, Officer Arnoux and Deputy Emerson determined there was sufficient information to forward the allegations of sexual conduct against Lindberg to detectives for further investigation. Near the end of the interview with the girls, the officers realized that Lindberg may have committed a sexual crime against H.B. as well. When questioned, H.B. was at first reluctant to talk about the incidents, preferring to focus instead on the abuse against A.T. However, H.B. did eventually speak about the sexual conduct against her. At the end of the interview, Deputy Emerson asked the girls if they had told anyone about the alleged conduct of Lindberg against them. They both responded that they had not.

¶9    Detectives Norman and Landis conducted a further investigation of the allegations, and interviewed the girls, their friends, including V.L. and M.T, and family members, including Lindberg and R.B. Immediately after law enforcement officials' interview of Lindberg, a restraining order was issued against him. Based on further investigation, charges were filed against Lindberg on December 23, 2003. The charges were later amended to include a misdemeanor sexual assault charge. The Amended

Information alleged that Lindberg committed felony sexual assault between January 1, 1995, and December 31, 1999, and between January 1, 2002, and December 31, 2002, when he knowingly subjected A.T. to sexual contact without her consent. The second count alleged that Lindberg committed the offense of felony sexual assault between January 1, 1995, and December 31, 1999, when he knowingly subjected H.B. to sexual contact without her consent. The felony sexual intercourse without consent charge alleged that Lindberg committed this offense between January 1, 1995, and December 31, 1999, when he knowingly and without consent had sexual intercourse with H.B., who was a minor at the time. Finally, the misdemeanor sexual assault charge alleged that Lindberg committed this offense when he knowingly subjected H.B—who had then reached the age of sixteen—to sexual contact without her consent. Lindberg requested a jury trial which was later set for July 5, 2005.

¶10 Prior to trial, the State filed a motion in limine to exclude any evidence regarding H.B.'s sexual orientation. In preparation for his defense, Lindberg's counsel had conducted an investigation of the events surrounding the allegations against him. These investigations purportedly established that H.B. had been involved in a sexual relationship with a female teenage friend named S.H. during the time of Lindberg's alleged criminal conduct. Lindberg claimed that he and other family members knew about this relationship and had strenuously objected to H.B. about it. As part of the theory of his defense, Lindberg intended to argue that his objection to this relationship provided a motive for H.B. to fabricate the allegations against him in an attempt to have

6

him removed from the home. Lindberg claimed that evidence about the nature of H.B's relationship with S.H was necessary for him to present his defense theory.

¶11 The District Court granted the State's motion in limine, concluding that any evidence of the sexual nature of H.B.'s relationship with another female was irrelevant to the issues at trial, and prohibited under Montana's rape shield law, § 45-5-511(2), MCA, and the authority of *State v. Johnson*, 1998 MT 107, 288 Mont. 513, 958 P.2d 1182. In explaining the reason for its decision, the District Court stated the following:

> In the present case, the nature of the relationship the alleged victim had with the other person is not relevant or material to the Defendant's theories. The defense can certainly offer <u>evidence</u> (not speculation or unsupported allegations), if there is any, that the Defendant objected to this other relationship and that the alleged victim wanted the Defendant removed from the house because of his objections. If upon cross-examination of the alleged victim, she denies the existence of this other relationship, or denies knowing that the Defendant objected to the relationship, her credibility can be attacked by any prior inconsistent statements, in accordance with Rule 613, M.R.Evid., and, of course, by the contrary testimony of other witnesses. However, the sexual nature of the relationship is not relevant or necessary to any of these issues or inquiries and evidence thereof is prohibited under Section 45-5-511(2), MCA, and <u>State v. Johnson</u>, *supra*.

¶12 During the trial, Lindberg, H.B., A.T., their grandparents, M.T., V.L., R.B., and the officers involved in the investigation presented testimony. H.B. testified on two occasions. During her first testimony, H.B., then approximately twenty years of age, struggled when recounting Lindberg's alleged acts and repeatedly broke down in tears. The District Court recessed for the day, and resumed the next morning with her testimony. However, H.B. continued to have difficulty completing her testimony. The District Court allowed her to be excused and received testimony from A.T. and B.B. before again having H.B. return to the stand. At this point, the State began using leading

questions to elicit testimony from her. Lindberg's counsel objected twice throughout the examination. On the first occasion, Lindberg's counsel objected on the grounds that all the questions used were leading questions. The District Court overruled the objection. Later in H.B.'s testimony, Lindberg's counsel again objected stating "Your honor, I would object. Continuing leading—a lot of leading questions here." The District Court denied the objection stating: "This one's not." At the very end of her direct examination, the State asked H.B. the following question: "At any time during the 1995 through 1998 incidents did the defendant penetrate your vagina?" H.B. responsed "Yes." Lindberg's counsel did not object to this question.

¶13 After H.B. concluded her testimony, Lindberg's trial counsel moved to strike it completely on the grounds that it had been developed through the use of leading questions. The motion was denied. Lindberg's counsel also moved for a mistrial on the same grounds. However, when the District Court requested authority in support of Lindberg's motion, Lindberg's trial counsel could not provide any. The District Court denied the motion for a mistrial.

¶14 As part of the theory of his defense, Lindberg maintained that both H.B. and A.T. despised him because he attempted to discipline them and impose structure on their lives which was lacking in the home environment, and that they made up the abuse allegations to have him removed from the home. Lindberg claims that life at the home was "chaotic," that little discipline or structure was imposed on the girls, and that the girls resented him for attempting to discipline them. At trial, he denied ever sexually assaulting or abusing the girls.

8

¶15    In closing arguments, the prosecutor made several comments which Lindberg now maintains were improper and denied him his rights to due process and a fair trial. For instance, at one point the prosecutor commented upon Lindberg's argument that the charges against him were part of a "huge conspiracy theory" between H.B., A.T., and their friends. The prosecution denied that such a scheme or conspiracy was planned by the girls. In making this argument, the prosecution contrasted the testimony of the girls and their friends with portions of Lindberg's cross-examination by the State as follows:

> I'd like you to contrast their testimony with that of the Defendant. He tells you he doesn't know why, other than possible discipline. He doesn't think they're evil children, but yet everybody's a liar. [A.T.'s] a liar, [H.B's] a liar, [M.T.'s] a liar, but he just doesn't know why, and it's a big conspiracy against him. Does that make sense? I argue to you, ladies and gentlemen, it does not.

¶16    The prosecutor then went on to unfavorably reference certain portions of R.B.'s testimony to the effect that H.B. was somehow partly to blame or responsible for the allegations against Lindberg.

> Contrast that also with [R.B.'s] testimony. Do we really know what [R.B.] knows or doesn't know? She has a lack of memory, she tells us, because of her alcohol, and you heard how much alcohol she was consuming at the time of all this happening. **She lied to you, ladies and gentlemen, in this courtroom when she took that stand. She told you one bold-face lie.** Mr. Guzynski [part of the prosecution team] asked her—I counted I think maybe three or four, maybe five times, "Last week—" and we're not talking in 2002, and we're not talking in the '95— '99 time period, we're talking last week "— last week did you have a conversation with [H.B], and in that conversation did you tell her that the thing you remember about when these incidents were going on, that 'you hung on the Defendant, you were too close to him' and blamed him—or blamed her for what happened?" She told you on that stand "Nope, I didn't say that." Mr. Guzynski asked her, "You sure you don't want to take a moment to think about that? Sure you don't want to change what your answer was?" And she told you as plain as day, "No."

You heard Detective Landis—Detective Landis has no motive to lie in this case—she heard it. She monitored that conversation last week, and that is in fact the statement that was made. And that also corroborates what [H.B] told you in her testimony, that [H.B] had a conversation way back when with [R.B], and [R.B] told her that she was to blame, that it was her fault. So I would ask you to contrast her demeanor also on the stand. Some of you may be thinking "Well, why would she still perpetuate this lie if possibly she's not still with the Defendant?" Did you see her demeanor when she came? I argue to you when she took the stand she immediately looked over and smiled at the Defendant. And when Mr. Guzynski asked her the point blank question "Are you still in love with the Defendant," there was a huge hesitation before she finally looked at you and kind of said "No." I argue to you, ladies and gentlemen, she still has feelings for the Defendant, and that is why to this day she is still choosing the Defendant over her children. And by her own admission, that is what she did before, and I argue to you that is what she's still doing today.

(Emphasis added.)

¶17 In rebuttal arguments, the prosecution again reiterated its view of R.B.'s credibility, and again stated that she lied in court. During closing argument, the prosecution also implied that the presentation of H.B's testimony was conditioned by the limits placed on that testimony by the rules of evidence: "the fact that she has no support from her mother, and the fact that when I'm in the courtroom I can't ask the kind of questions that make [H.B.] feel more comfortable in order to speak, that's why you got the reaction from [H.B] when we were in here." Additionally, the prosecution commented generally upon the credibility of the evidence presented by the State as follows:

The Defendant told you in his opening statement that the State was gonna muddy the water, we were gonna be the ones throwing mud, and we were gonna be the one giving you inconsistencies, innuendos. And I argue to you, ladies and gentlemen, the State was not the one that did that. **The State was here, and the State was here in a search for the truth. The**

10

> **State put on witnesses for you in that search for the truth, and the State put on witnesses and, I would argue to you, that were very genuine and very truthful to you.**

(Emphasis added.)

¶18  The prosecutor also stated that the testimony of A.T. had been corroborated by Detective Landis' interview of A.T.'s friends, and commented upon Lindberg's failure to call any of the girls' friends in support of his defense.

> The defense didn't dispute it.  They didn't bring any of these people in to say anything different.  And you heard they had access to all of their interviews and, not only that, they had access to interview these people themselves.

¶19  Along the same lines, the prosecutor commented upon Lindberg's failure to call S.H., the teenage girl with whom H.B. allegedly had a sexual relationship and whose testimony was the focus of the pre-trial motion in limine, as follows:

> You didn't hear from some witnesses, you didn't hear from S.H., some of the girls that disclosed.  Jeanne Landis testified that those people were interviewed.  She also testified that she was aware that Mr. Hawk [defense counsel's investigator] interviewed those people and had all those transcripts.  If there was something there, Your Honor—excuse me, ladies and gentlemen, the defense could have called those witnesses.  He's just trying to create confusion.  Why didn't they call those witnesses?  There's nothing there.

¶20  Lindberg's trial counsel did not object to any of these comments.  The jury deliberated four hours before returning a verdict of guilty on all four counts.  Lindberg was subsequently given forty-year concurrent sentences on each of the felony counts.

¶21  Lindberg now appeals his conviction.  He raises the following issues on appeal:

11

¶22    **Issue One:** *Did the prosecution improperly comment upon the credibility of the witnesses and assert that Lindberg was responsible for establishing his innocence, thereby denying Lindberg his right to due process and a fair and impartial trial?*

¶23    **Issue Two:** *Did Lindberg's trial counsel provide ineffective assistance of counsel by failing to adequately object to the use of leading questions during the prosecution's direct examination of H.B. and by failing to object to the prosecution's improper comments during closing arguments?*

¶24    **Issue Three:** *Did the District Court abuse its discretion and deny Lindberg his constitutional right to confront the witnesses against him and present his defense when it prohibited him from questioning H.B. about the alleged sexual nature of her relationship with S.H.?*

## STANDARD OF REVIEW

¶25    "If a prosecutor's improper comments prejudice a defendant's right to a fair trial, then the proper remedy is reversal." *State v. Sanchez*, 2008 MT 27, ¶ 51, 341 Mont. 240, ¶ 51, 177 P.3d 444, ¶ 51 (citing *State v. Stringer*, 271 Mont. 367, 381, 897 P.2d 1063, 1072 (1995)). We use a two-step analysis to determine whether improper comments have prejudiced a defendant's right to a fair trial. First, we determine whether the prosecutor made improper comments. Second, we determine whether those comments prejudiced the defendant's right to a fair trial. *Sanchez*, ¶ 51 (citing *State v. Gladue*, 1999 MT 1, ¶ 12, 293 Mont. 1, ¶ 12, 972 P.2d 827, ¶ 12). Moreover, "[t]he burden is on the defendant to demonstrate that a 'prosecutor's improper comments prejudiced his or her right to a fair and impartial trial. In determining whether prejudice resulted, the improper

comments must be viewed in the context of the case in its entirety.' " *State v. Wing*, 2008 MT 218, ¶ 33, 344 Mont. 243, ¶ 33, 188 P.3d 999, ¶ 33 (quoting *Gladue*, ¶ 27).

¶26 Ineffective assistance of counsel claims constitute mixed questions of law and fact which we review de novo. *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, ¶ 9, 183 P.3d 861, ¶ 9. To prevail on an ineffective assistance of counsel claim, the defendant must show that: (1) his counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced him. *Whitlow*, ¶ 10. The defendant must satisfy both prongs of the test, and where the defendant makes an insufficient showing as to one prong of the test, it is unnecessary to address the other prong. *Whitlow*, ¶ 11.

¶27 We review a district court's evidentiary rulings for an abuse of discretion and we afford district courts "broad discretion . . . to limit the scope of cross-examination to those issues it determines are relevant to trial." *State v. Beavers*, 1999 MT 260, ¶ 20, 296 Mont. 340, ¶ 20, 987 P.2d 371, ¶ 20.

¶28 **Issue One:** *Did the prosecution improperly comment upon the credibility of the witnesses and assert that Lindberg was responsible for establishing his innocence, thereby denying Lindberg his right to due process and a fair and impartial trial?*

¶29 Lindberg asserts that the prosecution made improper comments during closing arguments. He argues the emphasized comments cited above (*see* ¶¶ 16 and 17) constitute an improper characterization of R.B. as a "liar" as well as an improper offer of a personal opinion as to the credibility of the evidence by the prosecution. Lindberg argues that in *State v. Stringer*, 271 Mont. 367, 897 P.2d 1063 (1995) and *State v. Musgrove*, 178 Mont. 162, 582 P.2d 1246 (1978) we held that it is improper for a prosecutor to characterize either the accused or witnesses as liars, or to offer personal

opinions as to the credibility of a witness. Lindberg also cites to *State v. Stewart*, 2000 MT 379, 303 Mont. 507, 16 P.3d 391 for the proposition that "[i]t is well settled Montana law that closing arguments that reflect the prosecutor's personal opinions as to guilt are improper." *Stewart*, ¶ 42 (citing *Gladue*, ¶ 21). He maintains that the prosecution's violation of this tenet of law in this case constitutes reversible error.

¶30 Lindberg also argues that the prosecution's improper comments during closing arguments unconstitutionally shifted the burden of proof to him. In particular, Lindberg argues that the prosecution's reference to Lindberg's failure to call witnesses to refute H.B.'s and A.T.'s testimony and his failure to call S.H (*see* ¶¶ 18-19), implied to the jury that it was his burden to call witnesses to establish his innocence, when the State alone has the burden of proving his guilt beyond a reasonable doubt. Lindberg maintains that the improper comments, and the insinuation that it was Lindberg's responsibility to bring evidence to prove his innocence, prejudiced him and violated his right to a fair trial. Consequently, Lindberg seeks a new trial based on the alleged prosecutorial misconduct.

¶31 Recognizing that his trial counsel failed to object to any of these comments at trial, Lindberg maintains that the violations of his rights to due process and a fair trial are reviewable under the common law plain error doctrine as set forth in *State v. Finley*, 276 Mont. 126, 915 P.2d 208 (1996), *overruled on other grounds by State v. Gallagher*, 2001 MT 39, 304 Mont. 215, 19 P.3d 817. Lindberg cites to *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068 (1970) and maintains that these comments affected his constitutional right to have the State prove each element of the charged offenses against him beyond a reasonable doubt. He also asserts, citing to *State v. Newman*, 2005 MT 348, 330 Mont.

14

160, 127 P.3d 374, that his right to a fair trial under the Fourteenth Amendment has been violated as well. In support of his argument, Lindberg relies primarily upon *Newman* and *State v. Sullivan*, 280 Mont. 25, 927 P.2d 1033 (1996).

¶32 In response, the State advances two lines of argument. First, the State argues that that Lindberg's failure to object to the comments is fatal to his appeal and that his claims should not be reviewed under the common law plain error doctrine. Second, the State argues that even if this Court decides to reach the merits of Lindberg's arguments on appeal, they should be rejected because the comments by the prosecutor show no conduct which would warrant a new trial.

¶33 The State asserts that under this Court's post-*Finley* jurisprudence, we have consistently declined to invoke plain error to review a prosecutor's comments made during closing arguments, where the alleged comments did not implicate a defendant's right to remain silent under the Fifth Amendment to the United States Constitution and Article II, § 25 of the Montana Constitution. The State cites to several cases in support of its position, including *State v. Ogle*, 255 Mont. 246, 841 P.2d 1133 (1992), *State v. Smith*, 232 Mont. 156, 755 P.2d 569 (1988), and *State v. Daniels*, 2003 MT 247, 317 Mont. 331, 77 P.3d 224. In this regard, the State argues that *Sullivan* is distinguishable because there the Court only invoked plain error to review a prosecutor's improper comments which specifically focused on a defendant's post-*Miranda* silence. *Sullivan*, 280 Mont. at 36-37, 927 P.2d at 1040. Here, by contrast, the prosecutor commented upon Lindberg's failure to present evidence to corroborate his defense theory, and categorized R.B. as a "liar" while arguing the State's evidence was genuine and truthful, but did not comment

15

at all on whether Lindberg invoked his *Miranda* rights, or whether he remained silent after doing so.

¶34 While we do not condone the prosecutor's comments, we agree with the State, and decline to invoke plain error review of Lindberg's claims. As we stated in *Daniels*, "[t]he plain error doctrine is to be employed sparingly, on a case-by-case basis, pursuant to the narrow circumstances articulated in *Finley*. In order to determine the applicability of the plain error doctrine, we consider the totality of circumstances of each case." *Daniels*, ¶ 20 (citations omitted). Certainly, an argument can be made in this case that the prosecutor's comments were improper. In fact, Lindberg correctly notes that we have routinely chastised prosecutors for making improper comments on the credibility of the evidence before a jury, and in particular categorizing witnesses as "liars." As we stated in *State v. Arlington*, 265 Mont. 127, 158, 875 P.2d 307, 325 (1994), "[a]ny trial counsel who invades the province of the jury by characterizing a party or a witness as a liar or his testimony as lies, is treading on thin ice, indeed." We repeat this admonition to the prosecution in this case. Such comments are unnecessary, unprofessional and run the risk of undermining the fundamental fairness of the judicial process. The members of a jury are competent and capable of making their own credibility determinations, and needless intrusions into the province of the jury have no place in the jury trial system.

¶35 However, given the totality of the circumstances in this case, the prosecutor's comments do not rise to a level sufficient to invoke the plain error doctrine. The prosecution here did not comment upon a defendant's post-*Miranda* silence, but instead offered personal opinions as to the credibility of the witnesses and the significance of

16

Lindberg's failure to present evidence. Such comments did not have the effect of unconstitutionally shifting the burden of proof to Lindberg. Having reviewed the trial transcripts in their entirety and having considered all the evidence presented against Lindberg, we cannot say that failure to review Lindberg's claims will result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of Lindberg's trial, or compromise the integrity of the judicial process. *See Finley*, 276 Mont. at 137, 915 P.2d at 215. Thus, we decline to review Lindberg's claims under the plain error doctrine.

¶36 **Issue Two:** *Did Lindberg's trial counsel provide ineffective assistance of counsel by failing to adequately object to the use of leading questions during the prosecution's direct examination of H.B. and by failing to object to the prosecution's improper comments during closing arguments?*

¶37 Lindberg maintains that his trial counsel failed to provide effective assistance of counsel in two respects. First, he failed to object to the use of leading questions during H.B.'s testimony. Second, he failed to object to the prosecutor's improper comments during closing arguments.

¶38 With regard to his first argument, Lindberg points out that during the State's repeated attempt at a direct examination of H.B., the prosecution relied heavily upon the use of leading questions, but that his trial counsel objected to those questions on only two occasions. Lindberg asserts that the only evidence that he penetrated H.B. came in response to a leading question from the prosecution to which his trial counsel did not object. (*See* ¶ 12). Without this leading question and H.B.'s response, Lindberg argues he would have been entitled to a directed verdict on the sexual intercourse without consent charge because penetration is a necessary element of that offense, and, aside

17

from H.B.'s answer to the leading question, no other evidence was provided. Lindberg also notes that the jury seemingly recognized the State's difficulty in proving the elements of sexual intercourse without consent. During its deliberations, the jury sent a question to the court asking "Did [H.B.] actually speak the word 'penetration' or was it posed as a yes or no question?" Additionally, the jury asked if it would be possible to have a transcript of H.B.'s testimony. However, the District Court declined to provide an answer or a transcript, requiring the jury to rely on its own memory and notes.

¶39 As regards Lindberg's second argument for ineffective assistance of counsel, he maintains that counsel's failure to object to the prosecution's closing arguments was both deficient and prejudiced his right to a fair trial by allowing the State to improperly shift the burden of proof to him, instead of forcing the State to prove its case beyond a reasonable doubt. Lindberg argues that his claims are record-based and may be reviewed on direct appeal.

¶40 In *State v. White*, 2001 MT 149, 306 Mont. 58, 30 P.3d 340, we discussed the distinction between record-based claims, which as a procedural matter are reviewable on direct appeal, and non-record-based claims which are reviewable only in a petition for post-conviction relief. *White*, ¶ 12 (citing *Hagen v. State*, 1999 MT 8, ¶ 12, 293 Mont. 60, ¶ 12, 973 P.2d 233, ¶ 12). As we noted in *White*, an alleged failure to object to the introduction of evidence, the testimony of a witness, or prosecutorial misconduct, are generally considered record-based. *White*, ¶ 15. However, we also noted "that decisions regarding the timing and number of objections lie within counsel's tactical discretion, which would indicate that non-record based information explaining the tactic may be

18

involved, and thus should be barred from review on direct appeal." *White*, ¶ 16. We went on to explain the distinction between these two types of claims as follows:

> Though not easily distilled into a formula, the definitive question that distinguishes and decides which actions are record and which are non-record, is *why*? In other words, if counsel fails to object to the admission of evidence, or fails to offer an opening statement, does the record fully explain *why* counsel took the particular course of action? If not, then the matter is best-suited for post-conviction proceedings which permit a further inquiry into whether the particular representation was ineffective. Only when the record will fully explain why counsel took, or failed to take, action in providing a defense for the accused may this Court review the matter on direct appeal.

*White*, ¶ 20.

¶41 Under the authority of *White*, we agree with Lindberg that his claims for ineffective assistance of counsel are record-based, and may be pursued on direct appeal. As noted by the State, Lindberg's counsel did object on two occasions to the use of leading questions during H.B.'s testimony and was overruled. While the State suggests that counsel may have made a tactical decision to refrain from objecting further at the risk of alienating the jurors in light of H.B.'s fragile state at the time of her questioning, this suggestion is belied by the trial counsel's motion to strike, which is reflected in the record as follows:

> I have a motion to strike altogether the testimony of [H.B.] The State has exhibited throughout this—or has never exhibited that [H.B.] was incompetent to testify—to properly testify on direct. She didn't testify properly on direct. They were, for the most part, leading questions. The State led entirely through that. Therefore, it's improper direct examination, and we believe all of her testimony should be stricken.

¶42 The motion to strike reflects counsel's belief at the time that the State's direct examination was developed through leading questions and was improper and prejudicial

to his client. Moreover, when his motion to strike was denied, Lindberg's counsel then moved for a mistrial on the same grounds. The District Court denied both motions. The significance of these motions for purposes of the ineffective assistance of counsel analysis is clear: the decision not to object was not tactical, nor could counsel legitimately argue later that it was. Therefore, there is no reason to relegate this analysis to post-conviction proceedings.

¶43 Solely on the record, therefore, we can evaluate whether trial counsel's performance was deficient and whether "counsel's conduct fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." *Whitlow*, ¶ 20. In explaining his motion to strike, trial counsel made it clear that he failed to lodge appropriate objections to the use of leading questions by the State, and failed to bring to the District Court's attention that such a manner of direct examination was improper unless the State first demonstrated H.B. was incompetent to testify. Thus, by trial counsel's own standards, his performance was at least somewhat deficient.

¶44 As noted above, however, we review ineffective assistance of counsel claims under a standard of objective, as opposed to subjective, reasonableness. *Whitlow*, ¶ 20. A review of the trial transcripts demonstrates that the prosecutor did indeed employ some leading questions in his examination of H.B. Lindberg's ineffective assistance of counsel claim as to the leading question matter centers solely, however, on the notion that the specific question "At any time during the 1995 through 1998 incidents did the defendant penetrate your vagina?" is a leading question, and that his counsel's performance was

deficient in failing to object to it. We are unconvinced that, from an objective standpoint, this is in fact a leading question which would have been disallowed by the District Court upon proper objection.

¶45 Section 26-1-101(3), MCA, defines a "leading question" as "a question which suggests to the witness the answer which the examining party desires." M. R. Evid. 611 provides: "Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness' testimony." In *State v. Eiler*, 234 Mont. 38, 45, 762 P.2d 210, 215 (1988), relying on our opinion in *Bailey v. Bailey* , 184 Mont. 418, 421, 603 P.2d 259, 261 (1979)—both of which cases concerned the direct examination of a victim—we said that whether or not leading questions will be allowed is a matter within the trial court's discretion.

¶46 In *People v. Williams*, 941 P.2d 752 (Cal. 1997), the California Supreme Court stated that "[a] question calling for a 'yes' or 'no' answer is a leading question only if, under the circumstances, it is obvious that the examiner is suggesting that the witness answer the question one way only, whether it be 'yes' or 'no.' " *Williams*, 941 P.2d at 774 (quotations omitted). The fact that the specific question to which Lindberg now objects on appeal is one which could be answered with a "yes" or "no" does not, *ipso facto*, make the question a leading question. In order to establish deficient performance and prejudice, Lindberg must show that the prosecution instructed or suggested to H.B. how the question should be answered, and further that, had the objection been timely made, the District Court would have concluded that the question was leading and would be disallowed. Lindberg has failed to establish either matter. Because the question was

arguably not leading and because the allowance of leading questions is in any event a matter within the trial court's discretion, we cannot say from a standpoint of objective reasonableness that counsel's performance in failing to object to this question was deficient, or that Lindberg was prejudiced by counsel's failure to object. Therefore, we conclude that Lindberg has failed to satisfy the requirements of the ineffective assistance of counsel test. *Whitlow*, ¶ 10. Lindberg's ineffective assistance of counsel claim for failure to object to this question is accordingly denied.

¶47 With respect to Lindberg's claim for ineffective assistance of counsel based on trial counsel's failure to object to the prosecutor's closing arguments, we conclude that this claim is record-based as well, and may be reviewed on direct appeal. We agree that failure to object to these comments fell below an objective standard of reasonableness under prevailing professional norms in light of the circumstances of this case. We simply cannot conceive of any rationale under which defense counsel would sit on his hands and fail to object to such comments.

¶48 At the same time, we agree with the State that Lindberg was not prejudiced by this deficient performance to an extent that reversal of his convictions is warranted. The second prong of an ineffective assistance of counsel claim requires this Court to determine whether the defendant was prejudiced by counsel's deficient performance. In order for a defendant to show that he was prejudiced, he must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome.' " *Wing*, ¶ 43 (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984)).

¶49    Lindberg claims that the failure to object to the prosecutor's comments allowed the prosecutor to effectively shift the burden of proof to him. We disagree. As noted above, while certain of the prosecution's comments were improper, the comments must be viewed in their entirety and Lindberg has the burden of showing prejudice. *Wing*, ¶ 33. However, he has failed to specifically identify how these comments shifted the burden of proof to him.

¶50    Accordingly, Lindberg's claims for ineffective assistance of counsel for trial counsel's failure to object during closing arguments and failure to object to the use of leading questions by the prosecution during H.B.'s testimony are denied.

¶51    **Issue Three:** *Did the District Court abuse its discretion and deny Lindberg his constitutional right to confront the witnesses against him and present his defense when it prohibited him from questioning H.B. about the alleged sexual nature of her relationship with S.H.?*

¶52    Prior to trial, the District Court granted a motion in limine filed by the State to exclude any evidence or testimony regarding H.B.'s sexual orientation or sexual history. It had come to the State's attention that Lindberg might elicit testimony concerning an alleged sexual relationship between H.B. and a female friend, S.H. The State sought to exclude such testimony under Montana's rape shield law, § 45-5-511(2), MCA, and *Johnson*. Lindberg objected and argued that such evidence was an important aspect of his defense theory. Specifically, he claimed that it was his strenuous objection to H.B.'s

23

sexual relationship with this female friend that provided H.B. a motive to fabricate the allegations of abuse in order to have him removed from the home.

¶53 In its order granting the State's motion, the District Court correctly noted that its role in resolving the issue was to strike the proper balance between Lindberg's right to present a defense, and H.B.'s rights under the rape shield law. The District Court relied upon *Johnson* in support of this position. *See* ¶ 11.

¶54 Lindberg maintains that the District Court abused its discretion in this ruling, claiming that an understanding of the nature of H.B.'s relationship with S.H. was crucial to his defense so that the jury could fully understand the tension between him and H.B. and why H.B. would have been so outraged by Lindberg forbidding this relationship. Lindberg maintains that Montana's rape shield law was improperly applied to deny him his right to confrontation.

¶55 The State argues that the District Court did not abuse its discretion and that its reasoning was in accord with *Johnson* and *State v. Ahto*, 1998 MT 200, 290 Mont. 338, 965 P.2d 240. Moreover, the State maintains that the District Court's ruling allowed Lindberg to develop his theory that H.B. wanted him removed from the home due to his objection to her relationship with S.H, but correctly determined that the nature of that relationship was not relevant or necessary for the presentation of his defense theory in light of H.B.'s rights under the rape shield law.

¶56 We agree with the State and conclude that the District Court did not abuse its discretion. "Montana's rape shield law, § 45-5-511(2), MCA, provides that, with certain limitations, no evidence concerning the sexual conduct of the victim is admissible in a

case involving a sexual crime. This Court has held that the State has a compelling interest in preventing rape trials from becoming a trial on the victim's prior sexual conduct and thus has repeatedly upheld the rape shield law against Sixth Amendment attacks." *Ahto*, ¶ 16. As we stated in *Johnson*, "[t]he constitution does not require a blanket exception to rape shield statutes for all evidence related to motive to fabricate. Speculative or unsupported allegations are insufficient to tip the scales in favor of a defendant's right to present a defense and against the victim's rights under the rape shield statute." *Johnson*, ¶ 24. In this case, the District Court struck an appropriate balance between Lindberg's right to confront witnesses and develop his theory of the case, and H.B.'s rights under the rape shield law. The District Court provided Lindberg an opportunity to expose H.B.'s alleged motivation to fabricate the charges based on his disapproval of H.B.'s relationship with S.H., but also correctly reasoned that evidence of the sexual nature of that relationship was irrelevant, especially in light of the rape shield law. Accordingly, we conclude the District Court did not abuse its discretion in precluding Lindberg from questioning H.B. about her alleged sexual relationship with S.H.

¶57 Affirmed.

/S/ PATRICIA COTTER

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ JIM RICE