

DA 11-0325

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 259

STATE OF MONTANA,

        Plaintiff and Appellee,

   v.

DEREK JOEL BISHOP,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-Second Judicial District,
In and For the County of Carbon, Cause No. DC 10-26
Honorable Blair Jones, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Joseph P. Howard (argued), Attorney at Law, Great Falls, Montana

       For Appellee:

           Steve Bullock, Montana Attorney General; Jonathan M. Krauss (argued),
Assistant Attorney General, Helena, Montana

           Alex Nixon, Carbon County Attorney, Red Lodge, Montana

Argued and Submitted:  March 21, 2012
Decided:  November 13, 2012

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    Derek Joel Bishop (Bishop) appeals from his conviction for attempted sexual intercourse without consent, a felony, in the Twenty-Second Judicial District, Carbon County. The District Court sentenced Bishop to Montana State Prison (MSP) for a term of 15 years, with five suspended. Bishop appeals from the final judgment, including the court's decision to grant the State's motion in limine to exclude certain evidence.

¶2    We review the following issues on appeal:

¶3    *Whether the District Court violated Bishop's right to due process in excluding evidence of alleged sexual conversations between T.B. and Bishop and photos of third parties allegedly sent by T.B. to Bishop.*

¶4    *Whether Bishop's defense counsel provided ineffective assistance of counsel by not requesting a lesser-included offense instruction for sexual assault.*

FACTUAL AND PROCEDURAL BACKGROUND

¶5    Bishop, 37 years old, and T.B., 16 years old, worked together at Yellowstone Perk for two years. Yellowstone Perk operates an underage music venue in Billings, Montana. T.B. and Bishop did not associate outside of work, but considered each other friends. Bishop had a notion that he and T.B. had a long flirtation.

¶6    T.B., Bishop, and their boss Don Hurley (Hurley) went to Roberts, Montana, for the four-night, five-day Bull Pen Rally (Rally) in July 2010. Hurley, T.B., and Bishop operated a concessions trailer at the Rally for Yellowstone Perk. The Rally consisted of a concert series and festival.

¶7     Hurley, T.B., and Bishop arrived at the Rally on Wednesday, July 13, 2010. Hurley drove with T.B. in his motor-coach. Bishop drove Hurley's SUV and pulled the concessions trailer. T.B. slept the first night in Hurley's motor coach, but moved to the concessions trailer on Thursday night to avoid disturbing Hurley with her music player. Bishop slept in Hurley's SUV.

¶8     T.B. and Bishop closed the concessions trailer after midnight on Friday night of the Rally. T.B. changed into shorts at the port-a-potties and inserted a tampon due to the fact that she had just started menstruating. T.B. felt tired and wanted to go to bed. Bishop sat on T.B.'s sleeping bag in the concessions trailer and talked to her before she fell asleep. T.B. told Bishop, "If I fall asleep, you need to leave." T.B. fell asleep.

¶9     T.B. next remembers waking up to discover Bishop kneeling over her and kissing her stomach. T.B.'s pants were pulled down and her shirt was pulled up. T.B. pushed Bishop away and asked him what he was doing. Bishop said, "I'm sorry," and "I never meant to hurt you." Bishop then left the concessions trailer.

¶10    T.B. went to the port-a-potties and cried there for several hours. She noticed that she was "sore down there" and that her tampon had shifted positions. T.B. returned to the concessions trailer and fell asleep. Bishop woke T.B. early the next morning to start making coffee for customers. Bishop continued to apologize.

¶11    T.B. called her sister's boyfriend, Raleith, who lived in Lockwood. T.B. informed Raleith that she had been attacked by someone she did not know near the port-a-potties. Raleith immediately drove to Roberts. He called T.B.'s sister, Crystal. Raleith left T.B. in the security tent and notified T.B.'s family and the police.

3

¶12 Crystal believed T.B.'s story about the attack at the port-a-potties and told their mother about the incident. T.B.'s mother confirmed T.B.'s recounting of the incident, but did not believe T.B.'s contention that she did not know her attacker. T.B.'s parents went to the Rally to pick up their daughter.

¶13 Two police officers questioned T.B. at the Rally, but she did not feel comfortable talking to them there. The officers drove T.B. to Red Lodge to conduct the interview. T.B.'s parents met them there. T.B. told her parents before she went into the interview room that the attack had taken place near the port-a-potties. She declined to name her attacker. T.B. changed her version of the incident during the interview with the police officers. T.B. named Bishop as her attacker and told the police officers that the attack had taken place inside the concessions trailer.

¶14 T.B. drove to Billings where she underwent a four-hour Sexual Abuse Nurse Examiner (SANE) exam. The SANE nurse found a hickey on T.B.'s neck and a small tear just inside her vagina.

¶15 Police went to the Rally to interview Bishop. They took Bishop to Joliet for questioning. Bishop admitted that T.B. had been asleep on and off throughout the night. He claimed that he and T.B. had been playing, touching, and tickling. Bishop admitted to kissing T.B.'s body and pulling down her shorts so that he could "look" and "go halfway." Bishop claimed, however, that he had not been aroused during this encounter.

¶16 The State charged Bishop with felony sexual intercourse without consent, and in the alternative, felony attempted sexual intercourse without consent. Bishop's defense focused on his claim that the encounter had been consensual. In this regard, Bishop intended to

4

introduce conversations between Bishop and T.B. of an alleged sexual nature as evidence of previous sexual conduct between them.

¶17    For example, Bishop wanted to testify regarding a conversation in the days before the incident at the Rally that he claimed to have had with T.B. that had sexual content. He also sought to introduce what he claims were photos of semi-clothed women at the Rally that T.B. had sent to him on her cell phone at some point before the incident. Bishop claimed that T.B. had added captions to the photos that relayed something to the effect that T.B. would like to have sex with the women in the photos.

¶18    The State argued that Bishop's impressions regarding T.B.'s sexual preferences were irrelevant to a charge of attempted sexual intercourse without consent under M. R. Evid. 401-02. The State filed a motion in limine, pursuant to M. R. Evid. 401-03, to exclude alleged conversations of a sexual nature, Bishop's impressions regarding T.B.'s sexual preferences, and other categories of related evidence at trial. The State also sought to exclude as irrelevant and prejudicial the photos of the women at the Rally. The State further argued that the rape shield law, § 45-5-511, MCA, supported exclusion of all of these categories of evidence.

¶19    The District Court granted the State's motion in limine with respect to any prior sexual abuse of T.B., a photograph of T.B. from the SANE exam, and criminal histories or improper character evidence of any witness. The court reserved ruling on evidence concerning T.B.'s alleged sexual preferences and sexual history, as well as photos of the women at the Rally allegedly sent by T.B. to Bishop on T.B.'s cell phone.

5

¶20 The court heard from both parties on the day of the trial. The court ruled that Bishop could not present evidence regarding T.B.'s and Bishop's alleged conversations about sex or conversations about T.B.'s alleged previous sexual encounters with third parties that Bishop claimed to have discussed with T.B. The court also ruled that Bishop could not present evidence regarding the photos of the women at the Rally. The court further ordered the State, over Bishop's objection, to remove references to the photos from the interview tape of Bishop's police interview and accompanying transcript.

¶21 T.B. and Bishop both testified at trial. The testimony differed as to what happened the night of the incident at the Rally. T.B. testified that she and Bishop had conversed generally about music. T.B. did not remember many details about the evening. T.B. testified that she remembered waking up to find Bishop kissing her stomach. Bishop alleged that T.B. had been rubbing against his genital area throughout the night while lying on T.B.'s sleeping bag in the concessions trailer. T.B. denied it. T.B. did not recall allowing Bishop to hold her while she was sleeping. T.B. also did not remember having asked Bishop to give her a hickey.

¶22 During trial, the State asked T.B., "[w]hat sort of guy do you like?" in an effort to dispel the notion that T.B. had been attracted to a much older man like Bishop. Bishop argued that this question by the State had opened the door to Bishop asking T.B. about her preferred type of guy or girl to corroborate his claim that he and T.B. had discussed T.B.'s sexual preferences in the days leading up to the incident. The court ruled that the State's question had not opened the door to Bishop's claim that T.B. had expressed interest in bisexuality, homosexual conduct, and bisexual conduct.

6

¶23 Bishop testified regarding his interactions with T.B. in the days leading up to the incident. Bishop testified that he and T.B. had showered in the same "pod" at the Bull Pen Rally on one occasion, separated only by a curtain, and that they had showered in separate "pods" another time. Bishop claimed that he had given T.B. a hickey, at T.B.'s request, on Thursday morning. Bishop testified that he had asked T.B. on Thursday what kind of underwear she was wearing. Bishop claimed that T.B. had responded that she was wearing black thong underwear.

¶24 Bishop further testified that T.B. had let him run his hand over her leg on Friday night. Bishop also claimed that T.B. had told him that she was not wearing underwear at the time. Bishop testified that he and T.B. had many sexual conversations throughout Friday night. They both eventually fell asleep. Bishop further testified that T.B. had awakened him by rubbing against him, moaning, and repositioning herself. Bishop claimed that he had rested his head on T.B.'s stomach as a pillow, pulled T.B.'s shirt up to her ribs, and kissed her stomach.

¶25 The State repeatedly objected to Bishop's testimony on hearsay grounds. The court allowed Bishop's testimony about T.B. not wearing underwear as a statement against T.B.'s interest. The court sustained the State's objection to Bishop's testimony about "our conversation about everything." The court admonished Bishop to avoid testifying about conversations with T.B. unless a hearsay exception applied.

¶26 The court later ordered a recess and conference in chambers. The court outlined three areas of evidence that the parties had been confusing. The court clarified that its ruling on the State's motion in limine excluded certain conversations between Bishop and T.B. The

court confirmed the admissibility of the conduct between Bishop and T.B. at the Rally. And finally, the court emphasized that the statements made by T.B. during or incident to Bishop's conduct at the Rally could be admissible if they fit within a hearsay exception. The court reprimanded Bishop for conflating his alleged past conversations with T.B. and her contemporaneous conduct on the night of the incident. The court labeled these alleged past conversations "fairly superfluous."

¶27 Bishop avoided any testimony that contradicted the District Court's rulings for the rest of his direct testimony and his entire cross-examination. Bishop testified on redirect, however, that he and T.B. had been "exchanging verbally" throughout their relationship. After the court sustained an objection by the State, Bishop's counsel referred to specific conversations that Bishop allegedly had with T.B. that "covered a wide variety of topics." The court ordered Bishop's counsel to lay a foundation and identify a specific conversation. Bishop's counsel then asked Bishop about general conversations that Bishop had with T.B. during the week before the incident.

¶28 The court ordered counsel to chambers. Bishop's counsel argued that the State had misled the jury with T.B.'s testimony that she and Bishop generally had discussed their musical interests. Bishop sought to introduce evidence that he and T.B. had conversed about music and sex over an extended period. The court directed Bishop to discuss only those conversations contemporaneous to the incident at the Rally that led to Bishop's charges.

¶29 Bishop resumed his testimony on redirect after the conference in chambers. Bishop's counsel asked Bishop whether he and T.B. had any "talking communication" on the night of the incident. Bishop responded that they had conversations of a "sexual nature," and that

8

"the first conversation involved ménage à trois." The State requested immediately that the court and parties go into chambers. Bishop's counsel expressed surprise about Bishop's use of the sexual term. The court ruled that Bishop's statement went beyond the scope of cross-examination and violated the terms of the court's order on the State's motion in limine. The court granted the State's motion to strike the term. The trial resumed without further incidents.

¶30 The jury returned a verdict of not guilty to the charge of sexual intercourse without consent, § 45-5-503, MCA, and guilty to the charge of attempted sexual intercourse without consent, in violation of § 45-4-103, MCA. The District Court sentenced Bishop to 15 years at MSP, with five years suspended. Bishop appeals.

## STANDARD OF REVIEW

¶31 We review for abuse of discretion a district court's evidentiary rulings. *State v. Thompson*, 2012 MT 208, ¶ 13, 366 Mont. 260, __ P.3d __. A district court abuses its discretion if it acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in a substantial injustice. *Thompson*, ¶ 13.

## DISCUSSION

¶32 *Whether the District Court violated Bishop's right to due process in excluding evidence of alleged sexual conversations between T.B. and Bishop and photos of third parties allegedly sent by T.B. to Bishop.*

¶33 Bishop argues that the District Court denied him the right to present a complete and full defense when it excluded certain evidence. Bishop presented the theories of general

denial and of consent at trial. The court permitted extensive testimony by Bishop regarding T.B.'s alleged actions and words the night of the Rally in support of his theories.

¶34 The Montana Rules of Evidence grant a trial court discretion to evaluate evidence for relevancy and for possible exceptions to the general prohibition against hearsay. M. R. Evid. 401-03, M. R. Evid. 801-04. Montana's rape shield law, § 45-5-511, MCA, also generally precludes evidence concerning the sexual conduct of the victim. The rape shield law provides exceptions for "evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution." Section 45-5-511, MCA.

¶35 The District Court allowed Bishop to testify at some length regarding his interactions with T.B. leading up to the incident at the Rally. Bishop showered at the same time as T.B., separated only by a curtain, earlier that week. Bishop testified that he had given T.B. a hickey on the day before the incident. T.B. had told Bishop that she was wearing thong underwear on Friday morning at the Rally and that she had shown him the top part of her thong underwear.

¶36 Bishop provided extensive detail in his testimony regarding the actual night of the incident. Bishop and T.B. had sat together on her sleeping bag that night. T.B. had stuck her leg out for Bishop to rub. Bishop had rubbed T.B.'s leg up to her thigh. T.B. had told Bishop that she was not wearing underwear. Bishop had rubbed T.B.'s hand with his thumb. T.B. had been awake.

¶37 Bishop further made the following claims during his direct testimony. T.B. had nuzzled up to him shortly before the incident. He and T.B. had been lying together "in the

spoon position." T.B. had "scooted back" towards Bishop. He and T.B. had fallen asleep together. T.B. had woken him by "grinding her butt on [his] crotch." T.B. had then moaned and breathed heavily. T.B. later had woken Bishop up by rubbing her hands through his hair.

¶38 Bishop elaborated during his re-direct examination about the "7, 8" conversations that he claimed to have had with T.B. after the two of them had lain down on the mattress in the concessions trailer. Bishop explained that the conversations related to the physical touching in which he and T.B. were engaging and provided "the notification of things." He described that he "was going from one position and, then with her consent, moving into another situation and then into another." Bishop capped this line of questioning from his counsel with the fact that the first conversation of a sexual nature that he had with T.B. after they had lain down on the mattress "involved ménage à trois." The court granted the State's motion to strike this response.

¶39 Bishop endeavored to testify further about his and T.B.'s alleged conversations and conduct of a sexual nature in the week leading to the incident. Bishop argues that the District Court misinterpreted the phrase "sexual conduct" in § 45-5-511, MCA, in excluding these alleged conversations. He suggests that "sexual conduct" should be interpreted expansively to include the alleged communication between T.B. and Bishop. This expansive definition, according to Bishop, should have led the court to admit alleged conversations, text messages, and photos as evidence of "sexual conduct" between Bishop and T.B. He argues that even insignificant conduct, "when added together over a progression of time," can rise to the level of "sexual conduct" as contemplated by § 45-5-511, MCA.

11

¶40 Even if Bishop could demonstrate that the alleged conversations of a sexual nature in the days leading up to the night at the Rally could pass through the "sexual conduct" exception in the rape shield law—which we do not believe—the District Court still properly exercised its discretion in excluding the evidence. M. R. Evid. 402 requires evidence to be relevant for it to be admissible. *State v. Hardman,* 2012 MT 70, ¶ 13, 364 Mont. 361, 276 P.3d 839. The excluded conversations allegedly had taken place in the days leading up to the incident, or, at least, on the afternoon of the incident. Bishop failed to demonstrate how these conversations were relevant to his claim that T.B. had consented to the attempted sexual intercourse later that week, or later that night.

¶41 Moreover, Bishop's best effort to besmirch T.B.'s reputation involved his stricken testimony that he and T.B. had a conversation about a ménage à trois. Bishop never claimed, however, that T.B. stated that she wanted to include him in any ménage à trois. This testimony highlights the highly prejudicial nature of the excluded testimony. The highly prejudicial nature of Bishop's proposed testimony of alleged sexual conversations far outweighed any probative value of allowing the jury to hear Bishop's claim that he and T.B. had conversations of a "sexual nature."

¶42 The court allowed Bishop to testify exhaustively about T.B.'s alleged behavior and T.B.'s alleged conduct on the Friday night of the incident. The court rebuffed Bishop's attempts to testify to several specific alleged conversations with T.B. at the Rally in the days leading up to the incident. Bishop claims that the court excluded testimony regarding his and T.B.'s previous conversations based solely on the rape shield statute. We disagree. The court excluded these alleged previous conversations on relevancy grounds, when it deemed

the conversations "fairly superfluous." The court further excluded these alleged conversations on hearsay grounds. The court noted that the alleged conversations would not qualify as prior inconsistent statements by T.B. in light of the fact that Bishop had failed to cross-examine T.B. about these alleged conversations.

¶43 Exclusionary rules do not abridge a defendant's right to present a defense so long as the rules are not arbitrary or disproportionate to their purpose. *State v. Johnson,* 1998 MT 107, ¶ 22, 288 Mont. 513, 958 P.2d 1182. The court allowed Bishop to present a large portion of his testimony regarding alleged conversations of a sexual nature between T.B. and him on the night of the incident and in the days leading up to it. We cannot determine that the District Court abused its discretion by excluding a small portion of this alleged testimony. *Johnson,* ¶ 22.

¶44 A similar analysis applies to the District Court's exclusion of the photos of the women at the Rally. We note first that Bishop failed to make an offer of proof regarding the photos or to offer any objective proof of the photos' existence. Bishop's counsel warned the court at one point that he might seek a sidebar in the event that the issue of the photos arose in connection with potential testimony regarding "some statements made in some interviews already given." Bishop's counsel never sought a sidebar on the issue of the photos.

¶45 Even if the Court were to accept Bishop's claim at face value—that T.B. photographed semi-clothed women at the Rally on her cell phone, added captions expressing her desire to have sex with these women, and sent the captioned photos to Bishop—it still falls short on relevancy grounds. Bishop never claims that T.B. sent photos with captions that she wanted to have sex with Bishop. Bishop sought to introduce the photos to prejudice

13

T.B. in the eyes of the jury as a 16-year-old girl with a sexual appetite that extended to women, and with any luck from his perspective, to a much older man. The District Court excluded the photos of women at the Rally due to their lack of relevance and their prejudicial effect under M. R. Evid. 401-03.

¶46 Nothing in the record indicates that the court shortchanged or impaired Bishop's ability to put forth a robust defense based on his claim that T.B. had consented to his sexual advances. The District Court sought to strike an appropriate balance between Bishop's right to develop his theory of the case, to confront witnesses, and protect his due process rights, with the requirements of the rules of evidence. *State v. Lindberg,* 2008 MT 389, ¶ 56, 347 Mont. 76, 196 P.3d 1252. The District Court correctly determined that to admit into evidence all of the alleged conversations between T.B. and Bishop the week of the Rally would have amounted to an "examination into the nuances of the victim's interactions with the defendant days before an alleged rape." *State v. Detonancour,* 2001 MT 213, ¶ 24, 306 Mont. 389, 34 P.3d 487.

¶47 Bishop argues additionally that the court altered its evidentiary ruling mid-trial. The District Court called the parties into chambers after Bishop continued to testify to his alleged conversations with T.B., despite admonishments from the court. The court clarified that it would admit testimony regarding T.B.'s contemporaneous conduct and conversations with T.B. that satisfied a hearsay exception. The court previously had decided to exclude photos of women at the Rally, alleged conversations about T.B.'s sexual history, and alleged conversations regarding T.B.'s sexual preferences. The court's mid-trial clarification of

14

permissible testimony did not contradict its earlier decision to grant the State's motion in limine.

¶48    The District Court properly exercised its discretion when it excluded photos of the women at the Rally and several of the alleged sexual conversations between T.B. and Bishop. The court allowed Bishop to testify extensively in support of his theory that T.B. had consented to his sexual advances. The court did not violate Bishop's right to due process by excluding alleged conversations and photos on the basis that they were irrelevant or more prejudicial than probative under M. R. Evid. 401-03.

¶49    *Whether Bishop's defense counsel provided ineffective assistance of counsel by not requesting a lesser-included offense instruction for sexual assault.*

¶50    We decline to address Bishop's claim of ineffective assistance of counsel. The record fails to provide a sufficient explanation for the actions of Bishop's counsel in not seeking a lesser-included offense instruction. These issues are better examined within a postconviction relief proceeding. *State v. Clary*, 2012 MT 26, ¶ 30, 364 Mont. 53, 270 P.3d 88.

¶51    Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE

Justice Michael E Wheat dissents.

¶52    Section 45-5-511(2), MCA, provides that "evidence concerning the sexual conduct of the victim is inadmissible . . . except evidence of the victim's past sexual conduct with the offender . . . ." I dissent in this case because the District Court excluded evidence of sexually intimate conversations and cell phone text messages and photographs between T.B. and Bishop in the days leading up to the alleged assault on the grounds that they did not constitute "sexual conduct."

¶53    In *State v. Detonancour*, 2001 MT 213, 306 Mont. 389, 34 P.3d 487, we declined to extend the definition of "sexual conduct" to include "lingering touches, smoldering glances, the surreptuous [sic] passing of notes, casual contact between persons at social gatherings, and other methods of flirtatious behavior which form the invitation to engage in consensual sexual contact or sexual intercourse." *Detonancour*, ¶¶ 23-24. The conduct between T.B. and Bishop went well beyond flirtatiousness and into the realm of intimacy, and under the umbrella of what should be defined as "sexual conduct." If talking about sexually intimate relations and sharing nude photographs does not constitute "sexual conduct," then it can only mean actual physical sex, and that is not the intent of the statute. As we noted in *Detonancour*, the compiler's comments provide that, "if the victim and defendant have been *sexually intimate* previous to the alleged rape, the defendant may use evidence to this effect."

16

*Detonancour*, ¶ 21 (emphasis added).  For these reasons I would reverse and remand for a new trial.

/S/ MICHAEL E WHEAT

Justice James C. Nelson joins in the foregoing dissent.

/S/ JAMES C. NELSON